# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 28, 2001 Session

## STATE OF TENNESSEE v. CHRISTOPHER D. NEIGHBOURS

**Appeal as of Right from the Criminal Court for Davidson County**
**No. 97-B-1229      J. Randall Wyatt, Jr., Judge**

---

**No. M2000-02594-CCA-R3-CD - Filed March 28, 2002**

---

The appellant, Christopher D. Neighbours, was convicted by a jury of one count of first degree murder committed in the perpetration of a felony, namely kidnapping, and one count of especially aggravated kidnapping. The appellant received a total effective sentence of life plus twenty-five years incarceration in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions of both offenses. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee; Lionel R. Barrett, Jr., and Wesley MacNeil Oliver, Nashville, Tennessee, for the appellant, Christopher D. Neighbours.

Paul G. Summers, Attorney General and Reporter; T. E. Williams, III, Assistant Attorney General; Victor S. (Torry) Johnson, District Attorney General; and Lila Statom and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

On January 22, 1997, the victim, Marcus Deon Fortè, was living in Nashville with a longtime friend, Jerry Robinson, while they both attended American Baptist College. A friend of Fortè's from Ohio, "E," arrived for a visit, and Fortè requested Robinson's help in locating three pounds of marijuana for "E" to purchase.

Robinson, Fortè, and "E" visited Kenji McEwen, a friend of Robinson's, at the Service Merchandise store where McEwen worked. Robinson asked McEwen to help locate someone who would be able to sell "E" three pounds of marijuana. Subsequently, the four men went

to McEwen's apartment where McEwen eventually contacted Ronnie McAllister who agreed to obtain the marijuana. McAllister did not have the entire amount of marijuana available, so he in turn contacted Jeffrey Greg Downs. At some point that evening, McAllister, Fortè, and "E" decided to go to Downs' apartment to obtain the marijuana.

Approximately forty-five (45) minutes after the trio arrived at Downs' apartment, Jimmy Garvin and Mitchell Harrison arrived with the marijuana. Downs testified that he believed that Garvin obtained the marijuana from the appellant but conceded that he was not absolutely certain of that fact. Harrison waited downstairs while Downs, Garvin, McAllister, Fortè, and "E" gathered in Downs' upstairs bedroom to conduct the sale. Shortly after they assembled in the bedroom, "E" pulled a pistol from the waistband of his pants, pointed it at the group, and stole the marijuana. During his exit, "E" threatened Harrison's life if anyone tried to follow him.

After the robbery, Garvin made a cellular telephone call. Additionally, Fortè called Robinson at McAllister's apartment to advise him of the robbery. Robinson testified that Fortè sounded "upset, angry, and excited, all at the same time." Soon after the telephone calls, the appellant arrived at Downs' apartment with his girlfriend, Terry Garvin.[1] The scene was relatively calm until the appellant arrived. When the appellant walked through Downs' bedroom door, he immediately pointed his .35 caliber pistol at Fortè and asked him "if [Fortè's] life was worth three pounds of marijuana." Downs related that, as Fortè tried to explain the events, the appellant became angry and started pacing, cursing, and waving his gun. Downs testified that, at that point, he became frightened of being blamed because the drug deal had gone awry, and, in order to take the focus off of himself, he hit Fortè on the head with a portable telephone. Garvin then obtained a golf club from Downs' closet and began hitting Fortè in the back with the club. Harrison also struck Fortè. After the golf club broke, Garvin grabbed a nearby piece of wood and struck Fortè on the head. When blood from Fortè's head began to get on the carpet, Downs told Garvin to stop hitting Fortè. McAllister estimated that the beating lasted one hour but was unsure of the exact amount of time; however, he agreed that "it seemed like it went on for a long time." In contrast, Downs testified that the beating lasted only five minutes from the time Fortè was first struck until Fortè's hands and feet were bound. According to McAllister, the appellant kept his gun pointed at Fortè throughout the beating; however, Downs related that the appellant kept his gun in his hand but he did not point it at anyone during the assault. McAllister testified that, during the beating, he remained on the bed, too frightened of attracting similar violence to move or say anything.

Downs testified that, after the beating, the appellant suggested that they bind Fortè's hands and feet with duct tape. Downs obtained the duct tape and, at the appellant's instruction, first wound the tape across Fortè's mouth and around the back of his head. Next, Downs, Garvin, and Harrison bound Fortè's hands together, followed by his feet. Finally, they bound Fortè's hands and feet together in what was referred to at trial as the "hog-tie position." McAllister related that the appellant "took the gun, while Marcus [Fortè] was laying on the ground there and they were tying

_____

[1] Terry Garvin is Jimmy Garvin's sister.

him up, he put the gun to [Fortè's] head right there and asked him if he knew what that was." Additionally, McAllister maintained that he did not hear Fortè make any noise at that time. However, Downs asserted that Fortè groaned, grunted, and tried to pull his hands away from Downs during the taping.

After Fortè was bound, Harrison suggested that they put Fortè in the trunk of Harrison's car. Downs, Garvin, and Harrison carried Fortè downstairs, went out the back door, and placed Fortè in the trunk of Harrison's waiting car. The appellant, Harrison, and Garvin left the apartment while Downs, Terry, and McAllister stayed behind to clean the apartment. The three individuals who remained at the apartment used cleaning chemicals to remove the bloodstains from the carpet and the walls. Approximately two hours later, the appellant, Garvin, and Harrison returned to Downs' apartment. The appellant told Downs they needed to dispose of the duct tape, the golf club, and the stick that had been used during the offense. McAllister was allowed to leave, but, before he fled, Garvin told McAllister to pay the money that "E" should have paid or McAllister would be next. Later, Downs, Garvin, Garvin's girlfriend Keanuenue Kipilii, Harrison, Terry, and the appellant met at Garvin's house. Garvin, Harrison, and the appellant laughed and joked about a rap song that had been playing on the radio while they drove around with Fortè in the trunk. The lyrics in the song referred to a "body in the trunk" and a "murder after midnight." Soon the group dispersed.

The next day, McAllister, afraid for his life, packed to return home to West Virginia. He asked his mother to send him the money to pay Garvin for the stolen marijuana. Robinson, who had become concerned about Fortè, approached McAllister while McAllister was packing his truck. He pulled a gun and ordered McAllister to reveal what had happened to Fortè. The duo then went to a bank at Harding Place Mall so that McAllister could retrieve the money his mother had sent. A concerned bank teller called the police upon seeing McAllister so distressed. Through questioning McAllister and Robinson, the police then learned of Fortè's disappearance.

Detective Jeff West with the Metropolitan Nashville Police Department began the investigation into Fortè's disappearance. He first spoke with McAllister, who originally minimized his involvement so he could escape to his home in West Virginia. Detective West then contacted Fortè's mother, Gloria Fortè Butler, and learned that she had not heard from her son. In the course of the investigation, Detective West discovered that McAllister's original statement might not be entirely truthful. Accordingly, Detective West traveled to West Virginia and spoke with McAllister again. McAllister subsequently revealed more details of the offense. While Detective West was in West Virginia, other detectives in Nashville learned that Fortè's body had been dumped in Mill Creek.

After he returned to Nashville from West Virginia, Detective West went to Garvin's home to conduct an interview. Garvin initially agreed to take Detective West to Mill Creek to show the detective the location where Fortè's body had been dumped. Prior to leaving, Garvin requested permission to go into his bedroom to get his shoes. Garvin went into his bedroom, shut the door, and therein committed suicide.

The police began an extensive search of Mill Creek for Fortè's body. Detective West discovered the involvement of Harrison, Kipilii, and the appellant. On March 25, 1997, two fishermen discovered Fortè's "badly decomposed" body in the water approximately forty (40) miles from the location where Fortè had originally been left. There was duct tape around the mouth and head of Fortè's body, and the arms and legs were taped in a "hog-tie" fashion.

Dr. Emily Ward, a forensic pathologist working as a medical examiner for Davidson County, reviewed the autopsy records and photographs in this case.[2] Dr. Ward opined that Fortè died as a result of "homicidal violence." She related that the manner in which Fortè was bound with his arms and legs pulled behind him could have restricted his airflow sufficiently to ultimately result in death. Additionally, the tape over his mouth would have completely occluded his airway. Because of the extensive decomposition of the body, she could not conclusively determine if Fortè had died as the result of strangulation, beating, or drowning. However, Dr. Ward vehemently maintained that Fortè's death resulted from homicidal violence.

A jury in the Davidson County Criminal Court convicted the appellant of one count of felony murder, with the underlying felony being kidnapping, and one count of especially aggravated kidnapping. The jury sentenced the appellant to life imprisonment for the murder conviction. Pursuant to a sentencing hearing, the trial court sentenced the appellant to twenty-five years incarceration for the especially aggravated kidnapping conviction and ordered the sentence served consecutively to the life sentence. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions.

## II. Analysis

We begin our analysis by noting that a jury conviction essentially removes the presumption of innocence the appellant enjoyed at trial and replaces it with a presumption of guilt on appeal. State v. Suttles, 30 S.W.3d 252, 260 (Tenn.), cert. denied, 531 U.S. 967, 121 S. Ct. 401 (2000). Accordingly, when the appellant challenges the sufficiency of the evidence underlying his convictions, he bears the burden of demonstrating to this court why the evidence adduced at trial will not support the jury's findings. Id. In order to meet this burden, the appellant must establish that no reasonable trier of fact could have found the essential elements of the offenses in question beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). Additionally, as the prevailing party in the trial court, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. State v. Cottrell, 868 S.W.2d 673, 675 (Tenn. Crim. App. 1992). Moreover, we observe that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact." State v. Manning, 909 S.W.2d 11, 13 (Tenn. Crim. App. 1995).

---

[2] The actual autopsy was performed by Dr. Jones who, at the time of trial, was no longer working in Tennessee.

In order to obtain the appellant's conviction of felony murder, the State was required to prove, beyond a reasonable doubt, that the appellant killed Fortè in the perpetration of or the attempt to perpetrate a kidnapping. Tenn. Code Ann. § 39-13-202(a)(2) (1997); see generally State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). An appellant commits kidnapping when he "knowingly removes or confines another unlawfully[3] so as to interfere substantially with the other's liberty," and the appellant does so "[u]nder circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-302(a) and -303(a)(1) (1997). Additionally, the State argued that the appellant was criminally responsible for the actions of his co-perpetrators. Tenn. Code Ann. § 39-11-402(2) (1997) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Specifically, when the appellant is aware of the intentions of his co-defendants and proceeds to aid or attempt to aid in their endeavor, the appellant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997). "Criminal responsibility is not a separate crime. 'It is solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . , based upon the conduct of another person.'" State v. Prentiss Phillips, No. W2000-00245-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 182, at *20 (Jackson, March 9, 2001), perm. to appeal denied, (Tenn. 2001) (recommended for publication) (quoting State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)) (alteration in original).

We also note that, "[i]n Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Stout, 46 S.W.3d 689, 696 (Tenn.), cert. denied, __ U.S. __, 122 S. Ct. 471 (2001). The testimony of an accomplice must be corroborated by some evidence, whether direct or circumstantial, which fairly and legitimately tends to connect the appellant with the crime charged. Id. However, the corroborative evidence need not be sufficient on its own to support a conviction. Id. In this case, the testimony of McAllister, the testimony of Terry, and the phone records confirming calls made by Garvin all served to sufficiently corroborate the testimony of Downs, the appellant's accomplice.

There was no evidence that Fortè was prevented from leaving the apartment prior to the appellant's arrival at the premises. However, when the appellant walked into Downs' bedroom, he immediately pointed a pistol at Fortè and asked if Fortè's life was "worth three pounds of marijuana." It is clear that this action alone confined Fortè so as to unlawfully interfere with his liberty and exposed Fortè to the substantial risk of bodily injury, facts constituting the offense of kidnapping. See State v. Jason Cross, No. 03C01-9805-CC-00181, 1999 Tenn. Crim. App. LEXIS 805, at ** 21-22 (Knoxville, August 9, 1999). At this point, Downs, Garvin, and Harrison began beating Fortè while the appellant kept his gun focused on Fortè and observed the beating. See Phillips, No. W2000-00245-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 182, at *24. After the

---

[3] An unlawful removal or confinement is "one which is accomplished by force, threat or fraud." Tenn. Code Ann. § 39-13-301(2) (1997).

beating, the appellant suggested that they tape Fortè's mouth, hands, and feet. See State v. Anthony Perry, No. W1999-01370-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 514, at **14-15 (Jackson, July 13, 2001); State v. William B. Thurbley, No. 03C01-9709-CC-00414, 1999 Tenn. Crim. App. LEXIS 457, at *26 (Knoxville, May 11, 1999). Additionally, the appellant, Garvin, and Harrison placed Fortè in the trunk of Harrison's car. Downs also testified that Garvin admitted to him that he and the appellant rolled Fortè into Mill Creek and left him there. Fortè's body was ultimately discovered in the water, and Dr. Ward asserted that Fortè died due to "homicidal violence." We conclude that this evidence is more than sufficient to uphold the appellant's conviction of felony murder in the perpetration of a kidnapping.

The appellant asserts that "you can't kidnap the dead." Essentially, the appellant contends that Fortè was dead before he was kidnapped; specifically, he argues that, according to the testimony of McAllister, "Fortè was soundless, motionless and lifeless as he was being hog-tied." The appellant contends that Downs' claim that Fortè was moaning and attempting to move as he was being taped and that Fortè was begging for mercy even as he was thrown into Mill Creek is unbelievable. However, determining witness credibility is a matter exclusively for the jury. State v. Langford, 994 S.W.2d 126, 127 (Tenn. 1999). We will not make such determinations on appeal. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). We note that, upon our review of McAllister's testimony, we can find no reference to Fortè being "lifeless." McAllister merely indicated that he did not witness Fortè move or make sounds after the conclusion of the beating; however, this could be attributed to unconsciousness rather than lifelessness. Moreover, as we earlier concluded, Fortè was kidnapped when the appellant pointed the gun at him, essentially threatening Fortè's life if he moved. This issue is without merit.

Moving to the appellant's second conviction, we also find that there is sufficient evidence to uphold the appellant's conviction for especially aggravated kidnapping. An appellant commits especially aggravated kidnapping when he "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and "the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-302(a) and 39-13-305(a)(4) (1997). Additionally, Tenn. Code Ann. § 39-11-106(a) (1997) provides:

> (34) "Serious bodily injury" means bodily injury which involves:
> (A) A substantial risk of death;
> (B) Protracted unconsciousness;
> (C) Extreme physical pain;
> (D) Protracted or obvious disfigurement; or
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. . . .

Fortè was confined, that is he was not permitted to leave Downs' apartment, upon the appellant's arrival. The appellant blocked the doorway and pointed a pistol at Fortè. The appellant's co-perpetrators proceeded to beat Fortè severely, causing blood to gush from Fortè's head. Then, at the appellant's suggestion, the co-perpetrators "hog-tied" Fortè with duct tape and bound his mouth. See Phillips, No. W2000-00245-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 182, at **29-

30; <u>State v. Kevin Wilkins</u>, No. W1999-01462-CCA-MR3-CD, 2000 Tenn. Crim. App. LEXIS 640, at **17-20 (Jackson, August 18, 2000).  Downs testified that, after being taped and bound, Fortè was alive and moaning.  McAllister testified that Fortè was at least unconscious at this point, but it was within the purview of the jury to accredit the testimony of  Downs rather than that of McAllister.  Again, we will not substitute our judgment for that of the jury.  <u>State v. Taylor</u>, 669 S.W.2d 694, 698 (Tenn. Crim. App. 1983).  Dr. Ward testified that the taping of Fortè was such that it could have restricted Fortè's airflow causing death.  <u>See</u> <u>Perry</u>, No. W1999-01370-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 514, at *18 (stating that, in sustaining the defendant's conviction of especially aggravated kidnapping, "[t]he victim here suffered the ultimate serious bodily injury, death").  Thus, we conclude that there was ample evidence to prove that the appellant was guilty of especially aggravated kidnapping.

### III.  Conclusion
Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE