IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 10, 2001

# STATE OF TENNESSEE v. PRENTISS PHILLIPS

**Appeal from the Criminal Court for Shelby County**
**No. 97-13179-80     James C. Beasley, Jr., Judge**

---

**No. W2000-00245-CCA-R3-CD  - Filed March 9, 2001**

---

The defendant was convicted by a Shelby County jury of first degree murder and especially aggravated kidnapping. He was sentenced by the jury to life without the possibility of parole for the murder conviction. He also received a sentence of twenty-five years for the especially aggravated kidnapping conviction, to be served consecutively to his life sentence. The events of this case arose out of a confrontation between rival gangs living in the Hurt Village Apartments in Memphis. The defendant, a high-ranking member of the Gangster Disciples, was prosecuted for the crimes on a theory of criminal responsibility. In this appeal as of right, the defendant challenges the sufficiency of the evidence to support his convictions. After a thorough review of the extensive record in this case, we conclude that the evidence is sufficient to show that the defendant, acting with the intent to promote the commission of the charged offenses, directed and aided other members of the Gangster Disciples in the commission of the offenses. His convictions for first degree murder and especially aggravated kidnapping are, therefore, affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

A C Wharton, Jr., Shelby County Public Defender, Garland Ergüden, Assistant Public Defender (on appeal); William L. Johnson, Memphis, Tennessee; and Diane Thackery, Assistant Public Defender (at trial), for the appellant, Prentiss Phillips.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Patience R. Branham, Assistant District Attorney General; and Paula H. Wulff, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Following a five-day trial, the defendant, Prentiss Phillips, was convicted by a Shelby County jury of first degree murder and especially aggravated kidnapping. The jury sentenced the defendant to life without the possibility of parole for the first degree murder conviction. Following a sentencing hearing, the trial court sentenced the defendant to twenty-five years in prison for the especially aggravated kidnapping conviction, to be served consecutively to his life sentence. In this appeal as of right, the defendant raises one issue: whether the evidence was sufficient to support the convictions.

Having reviewed the extensive record in this case, we conclude that the evidence was sufficient to support the convictions for both first degree murder and especially aggravated kidnapping. Therefore, the judgment of the trial court is affirmed.

## FACTS

On April 30, 1997, a dispute between two toddlers in the Hurt Village Apartments in Memphis had a ripple effect that ended in the death of the victim, Vernon Green. Stepping into the toddlers' dispute, the mothers started their own fight. When word of the mothers' fight spread to their respective boyfriends, who were also the fathers of the toddlers, the altercation quickly escalated from a playground dispute into a gang confrontation. The fathers, in this case, were members of two rival gangs in Hurt Village: Jarvis Shipp, known as "J Roc," was a member the of Gangster Disciples and "Snoop" was a member of the Vice Lords. "Snoop" and two other Vice Lords, Rico and Zentrick, went looking for Shipp. When the rivals met, Shipp was accompanied by Chris James, known as "Big Chris," and "Popcorn," fellow Gangster Disciples. After the first swing was taken, a fight broke out. When members of "Snoop's" family came out of a nearby apartment with a gun, James took off running. "Popcorn's" hand was grazed by a bullet in the ensuing melee. The police ultimately arrived and broke up the fight.

Shipp, who held the rank of chief of security for the Gangster Disciples in Hurt Village, apparently wanted to call a general meeting of other Gangster Disciples to deal with both the affront of the Vice Lords and the desertion of James. Testimony is unclear as to whether the defendant, leader of all the Gangster Disciples at Hurt Village whose title was coordinator, made the call to "Chaos," leader of all the North Memphis Gangster Disciples, including those living at Hurt Village, whose title was governor, or whether Shipp made the call. There is little doubt, though, that even if Shipp made the call to "Chaos," the defendant knew of the call and approved of the subsequent meeting of some twenty-five to thirty members of the Gangster Disciples who came not only from Hurt Village but from the Mitchell Heights, Watkins Manor, and Binghampton areas as well.

The meeting was held late in the evening, in the Hurt Village apartment of three sisters, Natalie, Nicole, and April Black. The sisters' apartment was a place where gang members regularly hung out to "play cards and just socialize." The sisters all apparently had Gangster Disciple boyfriends, and Nicole, according to the defendant's statement, was a member herself.

Testimony was that the following, high-ranking Gangster Disciple members, in chain-of-command order from top down, were present at the Black sisters' apartment on the evening of April 30, 1997: "O. G. Lowdown," a board member from Chicago who came to Memphis monthly to check on things; "Chaos," the North Memphis governor living in Watkins Manor; Prentiss Phillips, the defendant and coordinator of Hurt Village; and Jarvis Shipp, the chief of security of Hurt Village. Also present that evening and testifying for the State were Chris James, Natalie Black, and Nicole Black.

Chris James testified that by April 30, 1997, he had been a member of the Gangster Disciples for three or four months. As a new member, he had no rank. James had lived in Hurt Village for seven years and knew the victim, Vernon Green. James testified that Green was not a member of any gang. James also knew the defendant as the highest ranking Gangster Disciple member in Hurt Village.

On the evening of April 30, close to midnight, when the defendant came into the Black sisters' apartment, he announced to the assembled group that Vernon Green was outside watching who was coming into the apartment. The implication was that Green was spying for the Vice Lords so that he could identify members of the rival Gangster Disciples. After the announcement, Gregory Robinson told two or three members to "go out there, snatch Vernon up." Once Green was inside the apartment, Robinson began to beat him.[1] James testified that Green said he was not watching the apartment but had just come back from a party at a club and was waiting for a friend. The victim begged the defendant to tell "his folks" to leave him alone. The defendant's response was that he had nothing to do with it now. James described what transpired next in the following testimony:

> A. Then Gregory [Robinson] still constantly beating on him, hit him on top of the head with a broomstick and everything. Bust his head open, had blood on the wall. Then next thing I know - -
>
> Q. What was the defendant doing during this period of time? Did he try to stop this fight?
>
> A. No, ma'am.
>
> . . . .
>
> Q. Okay. And after this beating, what took place?

---

[1] Although he was not from Hurt Village, Robinson apparently had connections there because Jarvis Shipp was his first cousin. Also, the defendant, in his first statement to the police, claimed that the victim and Robinson were "messing with the same female."

A. Then after the beating, they grabbed Vernon, took him upstairs. And when they took him upstairs, Gregory and them and Prentiss [defendant] had called a meeting again and they stepped in the kitchen.

After the victim was taken to a bedroom upstairs in the Black apartment, the next order of business was to punish James for having committed a violation of Gangster Disciple rules in that he failed to stay and help a fellow member fight a Vice Lord. James testified that his punishment was to receive a "Punkin Head." This punishment involved the violator's being beaten around the head by six other Gangster Disciple members for six minutes and sixty seconds, six being a number of special significance to the gang. The violator is beaten until his head swells from the trauma and it looks like a "punkin." James testified that the defendant ordered this punishment for him and that he received the "Punkin Head" that night while Green was being held in an upstairs bedroom.

James testified that Green was held upstairs for about an hour and was not free to leave. Green was finally brought downstairs by two gang members, one on each side of him, and his face was covered with a black T-shirt. James testified that while Green sat on a step, the defendant and Gregory Robinson each picked out the members who would drive with Green to Bellevue Park. Green was physically carried out of the apartment. James testified that he knew that Green was going to be killed. Once Green had been taken away, the defendant and another gang member, Steve Harden, walked James to his home. The defendant told James that if he did not keep quiet, the "same thing would happen to [him]."

On cross-examination, James testified that the defendant, "Chaos," "Lowdown," Robinson, and Shipp met separately in the kitchen, apparently to discuss what should be done about the affront to Shipp by the Vice Lords. "Chaos" and "Lowdown" came out of the meeting and stated that the incident was a personal matter that Shipp needed to deal with himself. "Chaos" and "Lowdown" then left the meeting. Although James's testimony under cross-examination was contradictory as to who was in the kitchen meeting and what the rank of the gang members present was, it was clear that the defendant participated in all high level meetings in the kitchen, including the one dealing with the punishment of James, and that the defendant held the highest rank of any of the Hurt Village gang members.

Natalie Black testified that, at the time of the meeting, she had been living in her apartment in Hurt Village since February 14, 1997. She had apparently come back to live in the apartment after she had been "out of town." The record indicated that Natalie and April had originally moved into the Hurt Village apartment some eleven months prior to the incident, and Nicole had moved in with them some eight months prior to the incident. Natalie knew both the victim and the defendant. She had known the defendant only a number of weeks from the time of her return to the apartment on February 14 to the date of the meeting.

Natalie Black identified the defendant as the coordinator of the Gangster Disciples in Hurt Village. She indicated that this meant the defendant was the person "over all the Gangster Disciples

in the area." She also testified that the victim, Vernon Green, was not a member of any gang. She recounted essentially the same sequence of events leading up to the meeting of the Gangster Disciples in her apartment as did James. At some point in the evening, prior to the beating of Green, Natalie Black and her two sisters were forced to go into one of the two upstairs bedrooms and stay there. A single box spring was placed over the outside of the door and a gang member, Isaiah Sepeccus, stood guard so that the sisters could not come out of the room. Nevertheless, Natalie testified that she was able to see out into the hall, including the last section of stairs leading to the second floor, by looking through a six-inch gap between the box spring and the partially closed door. She testified that she first heard loud thumping and music coming from the downstairs and then she saw Green being carried by two gang members up the stairs and into the other bedroom. She testified that the victim was not able to walk on his own but was being dragged up the stairs and into the bedroom by two gang members. She testified that she saw the gang members with two small handguns and that she had earlier seen two shotguns. After about an hour to an hour and a half, she saw Green being dragged downstairs, again by two gang members. Shortly thereafter, she heard the defendant, who was standing on the stairs, say that they were "going to have to kill Vernon because he would talk if they let him live." Although contrary to the testimony of James, Natalie said that she and her sisters were brought downstairs while James was still in the apartment. She testified that James appeared "beat up." During lengthy cross-examination, she testified that the defendant ordered the sisters to stand in line and then threatened them, warning each one that "if any of this leave this house, I'm going to send y'all in the same order that y'all in and kill y'all." At the time, the defendant was waving a gun at them. She testified that, "He pointed it [at] all of us, but mainly at my sister Nikki because she was - - Nicole, because she was standing next to me." They were ordered by the defendant to clean up the blood that was on the walls and sofa.

Nicole Black testified that she had known the defendant for eight months. The record indicated that Nicole was six months pregnant and had been allowed out of the bedroom at least once during the meeting to use the bathroom, but she was escorted there and back. She testified that, while in the bathroom, she saw four cars parked outside in the parking lot, cars that she had never seen before. She testified further that she also saw the victim being "escorted" back down the stairs.[2] Nicole responded to the following questions concerning the rank of the defendant:

> Q. Did you have any personal knowledge as to whether Prentiss Phillips had any ranking in the Gangster Disciples?
>
> A. Yes, I did.
>
> Q. And what ranking was that?
>
> A. I was told personally from Prentiss Phillips that he was the coordinator.

---

[2]Unlike the other State's witnesses there that evening, Nicole Black testified that the victim was held upstairs only ten to fifteen minutes before he was "escorted" back downstairs.

Q. He told you that himself[?]

A. Yes.

Q. And did he tell you what that meant?

A. No. I already knew the meaning to that.

Q. And what do you know the meaning to be?

A. From my knowledge it is the one who brings everything together, the meetings and whatever they choose to do like that.

Q. Do they have any authority as far as giving orders?

A. Yeah, they are the main one that gives out the orders. You follow everything that the coordinator says.

Nicole Black was not cross-examined by the defense.

On three separate occasions, the defendant gave signed statements to the police in which he claimed to have no position at all in the Gangster Disciples, although he admitted to being an "OM" or an outstanding member. The defendant, nevertheless, also stated that it was "Lowdown," the board member from Chicago, who paged him after the murder of Green and told the defendant that he and the "rest of the brothers need to keep our mouth closed, and if we didn't, we'd be dealt with. And by me being a member, I knew that they meant death." The defendant chose not to testify at the trial.

Raymond Pearson testified that he belongs to a walking group who meets regularly at 5 a.m. at Bellevue Park to walk the track together. On the morning of May 1, 1997, he left the group in the parking lot and drove his truck to an area where the lights to the track could be turned on. When he reached the switch box, he noticed, out of the left window of his truck, a body lying on the ground. Concerned, he turned his lights on full beam and backed up. The body did not move. He turned the truck so that the lights were shining directly on the body. At that point, he could see that the person had been shot in the head over his eye. The police were called and responded immediately.

Officer Alvin Peppers, a twenty-five-year veteran with the Memphis Police Department, was one of the officers who responded to the crime scene. Peppers testified that as a crime scene officer, it was his job to photograph the scene and collect any physical evidence. What he found at Bellevue Park on this particular morning was the "body of a male black lying in the middle of the park." The body was face down in a prone position. Officer Peppers identified live and spent casings collected at the crime scene. Among those, Peppers identified spent .45 caliber casings, a live .45 caliber round, and spent .20 gauge casings.

Dr. Thomas Deering testified as an expert in the field of forensic pathology. According to his testimony, the victim sustained five wounds, including three to the head, one to the left buttock, and one tangential wound across the back. Two of the three wounds to the head were from gunshots, that is from a pistol or a rifle. The other three wounds were from a shotgun. Dr. Deering concluded that the victim was first shot with a shotgun in the left buttock. This would have been "an exquisitely painful wound." Small metal pellets from the shotgun perforated the victim's rectum, the last part of the colon, the bladder, and the prostate. This wound would most likely have been fatal, according to Dr. Deering, although death would have come slowly from bleeding. The victim was fully functioning at the time he received this wound. Death would have occurred immediately after the shotgun wound to the head. This wound "basically just blew apart the skull, and it so shredded the brain and the brain stem that he would've died within, you know, seconds to minutes versus hours to days." The two gunshot wounds to the head entered on the right side and would most likely have been fatal. The two gunshot wounds came after the fatal shotgun wound to the head.

## ANALYSIS

### ISSUE: SUFFICIENCY OF THE EVIDENCE UNDER
### CRIMINAL RESPONSIBILITY THEORY

The defendant asserts that the evidence presented at trial was insufficient to support his convictions for first degree murder and especially aggravated kidnapping. The State's theory was that the defendant was criminally responsible for both offenses.

### I.  Standard of Review

In Tennessee, the results reached by a jury in a criminal trial are afforded great weight. See State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995). On appeal from a guilty verdict, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from the evidence. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).

## II. Criminal Responsibility for First Degree Murder

The defendant asserts first that the evidence was insufficient to convict him of first degree murder. The trial court, at the hearing on the motion for a new trial, stated the following:

> With regard to the charge of murder in the first degree, again, the issue is his rank, his ability to make these commands or these orders. Based on the testimony, again, he was the ruling member, at least within this community, the community of Hurt Village, of the Gangster Disciples.
>
> According to one of the witnesses who said that she heard him say Mr. Green was going to have to be killed. According to another witness who said Mr. Phillips picked out the individuals or part of the individuals who actually took Mr. Green out and executed him, the Court is satisfied from the proof, again, the theory of a conspiracy, criminal responsibility, that Mr. Phillips was responsible for the actions of these individuals . . . .
>
> Again, I'm satisfied from the proof that Mr. Phillips' leadership capacity and role was established such that he can be and by law and the jury apparently felt was criminally responsible for the actions of those six individuals who went out and actually shot and killed Mr. Green.

A person criminally responsible for the conduct of another may be charged with the commission of the offense. See Tenn. Code Ann. § 39-11-401(b) (1997). This theory of guilt is based on the common law provision of criminal liability for principals, accessories before the fact, and aiders and abettors. See id. § 39-11-401, Sentencing Commission Cmts.; see also Presley v. State, 30 S.W.2d 231, 233 (Tenn. 1930) (concluding that the aiding and abetting of one brother in holding back bystanders while the other brother attacked his wife rendered the acts of assistance indisputably unlawful). The common law terms are no longer used;[3] instead, the Code provides that "any person may be charged as a party if he or she is criminally responsible for the perpetration of the offense." Tenn. Code Ann. § 39-11-401, Sentencing Commission Cmts. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids,

---

[3]Also no longer of relevance is the former common law element of the presence of the aider and abettor at the scene of the crime, see, e.g., Flippen v. State, 365 S.W.2d 895, 899 (Tenn. 1963), or the absence of the accessory before the fact at the scene of the crime, see, e.g., State v. Ayers, 67 Tenn. (8 Baxt.) 96, 99 (1874).

or attempts to aid another person to commit the offense[.]" <u>Id.</u> § 39-11-402(2).[4]  This wording is intended to include the conduct of defendants formerly known as accessories before the fact and aiders and abettors.  <u>See</u> <u>id.</u> § 39-11-402, Sentencing Commission Cmts.

Criminal responsibility is not a separate crime.  <u>See</u> <u>State v. Lemacks</u>, 996 S.W.2d 166, 170 (Tenn. 1999).  "It is solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . ., based upon the conduct of another person."  <u>Id.</u>  The legislative intent in promulgating the theory of criminal responsibility is clearly to "embrace the common law principles governing aiders and abettors and accessories before the fact."  <u>State v. Carson</u>, 950 S.W.2d 951, 955 (Tenn. 1997).  Although terminology may have changed from the common law, the rationale of liability remains the same.  It was stated by our supreme court in 1895 in the following words: "No man can authorize another to do what he may not lawfully do himself.  If the attempt to confer such authority be made, and the unlawful act be done, both are guilty."  <u>Atkins v. State</u>, 95 Tenn. 474, 32 S.W. 391, 391 (1895).

While guilt by association is a doctrine that is thoroughly discredited, <u>see</u> <u>Uphaus v. Wyman</u>, 360 U.S. 72, 79, 79 S. Ct. 1040, 1045-46, 3 L. Ed. 2d 1090 (1959), this court has noted that, under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred.  <u>See</u> <u>State v. Ball</u>, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998).  No particular act need be shown, and the defendant need not have taken a physical part in the crime.  <u>See</u> <u>id.</u>  Mere encouragement of the principal will suffice.  <u>See</u> <u>State v. McBee</u>, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982).  To be criminally responsible for the acts of another, the defendant must: "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" <u>State v. Maxey</u>, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting <u>Hembree v. State</u>, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).  The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime."  <u>State v. Foster</u>, 755 S.W.2d 846, 848 (Tenn. Crim. App.), <u>perm.</u> <u>app.</u> <u>denied</u> (Tenn. 1988).

---

[4]The language of this section actually sets forth three ways in which a person may be found criminally responsible for an offense committed by the conduct of another:

> **Criminal responsibility for conduct of another.**—A person is criminally responsible for an offense committed by the conduct of another if:
> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402 (1997).

To obtain a conviction for first degree murder, the State must prove:

> (1) A premeditated and intentional killing of another;
>
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or
>
> (3) A killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a). Proof at trial established that the victim, Vernon Green, was murdered in a gang-style execution that was both premeditated and intentional and was also committed in the perpetration of a kidnapping. Therefore, the crime of first degree murder was established.

The testimony of three witnesses corroborated the presence of the defendant at the meeting of the Gangster Disciples held on April 30, 1997, at the Black sisters' apartment. The evidence established the position of the defendant in the gang hierarchy as "coordinator." He was shown to be the one in charge of all gang members in the Hurt Village area. It was the defendant who announced the presence of the victim outside the apartment, supposedly as a spy. Once the victim was in the midst of the gang members, his only hope for assistance was the defendant, the man in charge at Hurt Village. Although there was testimony that other leaders and other members from North Memphis were present, apparently for the purpose of deciding how to handle the affront to Jarvis Shipp by the Vice Lords, a rational jury could have concluded that the defendant was in a position of such importance that nothing of the nature of a kidnapping, beating, and murder would happen without his assent. There was testimony that the defendant stated that there was no alternative but to kill the victim in the interest of preserving the safety of the gang. Evidence was presented that the defendant selected at least three of the gang members who drove the victim to Bellevue Park in the early hours of May 1, 1997, and murdered him.

Although the defendant claimed in his statement to the police, read at trial, that he was just an ordinary member of the gang, the jury could have reasonably disbelieved the statement, especially since "Lowdown," the high-ranking member of the board of directors of the Gangster Disciples from Chicago, knew how to "beep" the defendant and gave him a warning about not allowing any information to get out, a warning that the defendant was told to relay to all other members of the gang involved in the incident.

We acknowledge the challenges faced by the jury in cases such as this one where the truth is clouded by secret and elaborate gang rituals; the use of two and three code names for gang members; and the commission of crimes by groups. Nevertheless, here, a rational jury could have concluded beyond a reasonable doubt that the defendant was a high-ranking leader of the Gangster Disciples and was present with other members at the apartment of the Black sisters prior to the

-10-

murder; that the defendant knew what was to happen to the victim from the time the victim was brought into the apartment; that the defendant shared in the intent to murder the victim; that the defendant maintained a close affiliation with the co-perpetrators of the crime after its commission; and that the defendant failed to report the crime. From this record, we conclude that the evidence was sufficient to support the defendant's conviction for first degree murder based on a theory of criminal responsibility.[5]

### III. Criminal Responsibility for Especially Aggravated Kidnapping

Next, the defendant asserts that the evidence was insufficient to support his conviction of especially aggravated kidnapping. The trial court stated the following at the hearing on defendant's motion for a new trial:

> So to the extent of Mr. Phillips' involvement in this, in my opinion, conspiracy to commit an aggravated kidnapping, which turned into an especially aggravated kidnapping, because Mr. Green was beaten and subsequently killed, Mr. Phillips in my opinion was as much involved as any other player, and whether he was the one who actually went out and by hand brought him in, whether he was the one who detained him in the upstairs room, or whether he was first in command or second in command, the entire group of Gangster Disciples were responsible in my opinion, for detaining Mr. Green, and at least to the extent of Mr. Green's - - the injuries inflicted upon him before he was killed, Mr. Phillips was either an active participant or was standing there with the right to stop all of this if there was some misunderstanding
>
> He didn't step in, he didn't interfere. According to one of the ladies, his testimony, his statement was, We're going to have to kill him because he knows too much or he'll talk, and then he later on

---

[5]In People v. Mullen, 730 N.E.2d 545, 552 (Ill. App. Ct. 2000), appeal denied, 738 N.E.2d 933 (Ill. 2000), the court affirmed the conviction of the defendant for first degree murder on a theory of criminal accountability. The defendant was with a group of ten to fifteen members of the Gangster Disciples in Chicago who chased the victim down a street, pulled him from his truck, and beat him to death. The defendant, who was positively identified by bystanders as being one of the group, claimed that he was just present during the beating. Id. at 551. The Illinois Appellate Court, in affirming the conviction, stated the following:

> Here, defendant chased the victim, stayed during the beating, and stood over the victim as codefendant Towsend kicked the victim while another man hit the victim with a bat. Defendant did not offer to help, he did not discourage or disapprove of the crime, he came and left with the group that actively participated in the beating and he did not report the crime. Thus, although Norfleet [eyewitness] did not see Mullen hitting or kicking the victim, a rational trier of fact could find that defendant was accountable because he was not merely present during the beating.

Id. at 552.

-11-

said to all of those witnesses, if anybody talks or says anything about what went on in here, you're going to die, too. That gives the Court the impression, I think it gave the jury the impression, Mr. Phillips was a high-ranking individual involved in this gang, with the ability and/or the authority to have those orders carried out.

. . . .

So, I'm of the opinion that Mr. Phillips, that the law that was -- the evidence that was presented satisfied the law of especially aggravated kidnapping, and there was sufficient evidence to show that Mr. Phillips was involved in that kidnapping and subsequent execution of Mr. Green.

To obtain a conviction for especially aggravated kidnapping, the State must prove: (1) the defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with his liberty; and (2) the defendant accomplished the false imprisonment with a deadly weapon or by display of an article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon, or the victim suffered serious bodily injury. See Tenn. Code Ann. §§ 39-13-305(a)(1)(4), 39-13-302. "Serious bodily injury" means bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. See id. § 39-11-106(a)(34).

The victim was forcibly "snatched" from outside the Black sisters' apartment by members of the Gangster Disciples and was taken inside where he was terrorized and beaten. James testified that the victim was never free to leave once he had been "arrested." Natalie and Nicole Black both testified that they saw the victim being dragged by two gang members up the stairs of their apartment. The victim was so severely beaten that he could not walk on his own and his head was hanging down. James testified that the victim's head was covered with a black T-shirt when two gang members carried him from the apartment to a car. The victim was placed on the seat between two gang members. Natalie Black testified that she saw weapons in the possession of the gang members who dragged the victim upstairs. Dr. Deering testified that, given the nature of the shotgun wound to the victim's head, it was hard to tell whether the victim had sustained specific prior wounds. We conclude that there is sufficient evidence to support the defendant's conviction for especially aggravated kidnapping.

A defendant may be convicted of especially aggravated kidnapping under a criminal responsibility theory, regardless of whether there is evidence that he directly participated in the criminal act itself. As noted in the preceding section, evidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that he intended to aid in or encourage its commission and will sustain his conviction for the offense committed by others. James testified that it was the defendant who alerted the gang

members to the presence of the victim. James's testimony is less clear concerning the orders given to beat the victim and then hold him prisoner in the upstairs bedroom. James indicated that the individual giving these orders was Gregory Robinson. Robinson was from another area of North Memphis and was directly linked to "Chaos", the governor and superior of both Robinson and the defendant. At one point in his testimony, James placed Robinson above the defendant in rank and later placed him below the defendant. Whatever their relative levels of authority, the defendant must have known that by announcing that the victim was outside spying on the meeting, he was setting in motion a series of acts that would lead to the kidnapping and beating of the victim. The defendant was fully aware of the weapons in the possession of various gang members and, in fact, had a gun himself. The fact that the victim sought help from the defendant indicates that the defendant was in a position of authority to intervene. The defendant, instead of intervening, watched while the victim was beaten and then dragged upstairs where he was held captive for over an hour.

We conclude that the evidence was sufficient to prove that the defendant was criminally responsible for the especially aggravated kidnapping of the victim.

## CONCLUSION

In our view, the evidence is sufficient to show that the defendant, acting with the intent to promote the commission of the charged offenses, directed and aided other members of the Gangster Disciples in the commission of the offenses. We conclude, therefore, that a reasonable jury could have found the defendant guilty beyond a reasonable doubt of criminal responsibility for the first degree murder and especially aggravated kidnapping of Vernon Green. The judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE

-13-