IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 22, 2004

**STATE OF TENNESSEE v. JULIUS Q. PERKINS**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-A-569      J. Randall Wyatt, Judge**

---

**No. M2003-01761-CCA-R3-CD - Filed January 6, 2005**

---

Defendant, Julius Q. Perkins, was indicted on one count of first degree premeditated murder and one count of first degree felony murder. Following a jury trial, Defendant was found guilty of felony murder and not guilty of premeditated murder. He was sentenced to life imprisonment. On appeal, Defendant argues that the evidence was insufficient to support his conviction of felony murder because the State failed to show that the victim was killed during a robbery or attempted robbery, or, alternatively, that Defendant was criminally responsible for the death of the victim. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Paul J. Walwyn, Madison, Tennessee, for the appellant, Julius Q. Perkins.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; Dan Hamm, Assistant District Attorney General; and Kimberly Cooper, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Bryan Creavalle and the victim, Ron Palmer, shared a second-floor apartment. The apartment building had a single entry on the first floor. A flight of stairs led to a middle landing, turned, and continued up to the second floor where the victim's apartment was located. Mr. Creavalle testified that he heard a commotion in the hallway outside his apartment some time after midnight on December 9, 2001. Mr. Creavalle heard Mr. Palmer call out his mother's name first and then Mr. Creavalle's name. Mr. Creavalle opened the front door and saw the victim on the floor wrestling with a man who was later identified as Johnny Woodland. The victim was trying to take Mr. Woodland's gun away as the two men struggled.

Mr. Creavalle returned to his apartment and retrieved a dumbbell which he threw at Mr. Woodland. The dumbbell missed Mr. Woodland, and Mr. Creavalle went back inside the apartment. He returned to the hallway in a few minutes and saw Defendant standing at the bottom of the stairs in front of the building's entryway. Defendant was pointing a gun up the stairs. The victim began to run back to his apartment, and Mr. Creavalle heard Mr. Woodland tell Defendant to "shoot him, shoot him."

The victim stumbled as he ran up the stairs, and Mr. Creavalle was pulling the victim into the apartment when three shots were fired. Mr. Creavalle did not know which of the two intruders fired the gunshots. Mr. Creavalle managed to get Mr. Palmer inside the apartment and closed the door. Someone banged on the front door, and then Mr. Creavalle heard footsteps going down the stairs. The victim bled to death shortly thereafter.

Mr. Creavalle said that the victim was dressed in boxer shorts and a tee-shirt and was not armed.

Phyllis Palmer, the victim's mother, lived in the apartment across the hall from her son's apartment. She heard noises in the hallway around 1:30 a.m. and opened her front door. Mrs. Palmer saw her son struggling with Mr. Woodland. Mrs. Palmer said that Mr. Woodland had a gun, and the victim was trying to keep Mr. Woodland from firing his weapon. Mrs. Palmer went back in her apartment and attempted to call 911. When Mrs. Palmer opened her door again, the victim and Mr. Woodland had rolled down the stairs and were still struggling. Mrs. Palmer saw Mr. Creavalle standing by the front door of his apartment. She, too, heard three gunshots.

Dr. John Gerber supervised the victim's autopsy. Dr. Gerber said that Mr. Palmer had two bullet wounds, one in the leg and the other in the chest. The chest wound was the injury that caused the victim's death.

Charles Pinkerton, a neighbor, said two men exited the apartment building after the shots were fired. The shorter man carried a gun and was limping. Mr. Pinkerton could not tell if the second man was armed.

Officer Daniel Orr assisted in the collection of the bullets and shell casings found in the apartment building's stairwell. One nine millimeter shell casing was found at the bottom of the first flight of stairs in the entryway, and a second nine millimeter shell casing was found on one of the steps leading up to the middle landing. Three nine millimeter bullets were found in the stairwell–two on the first flight of stairs and one on the middle landing. Two .357 caliber bullets were also found on the on the middle landing of the stairway. A bullet's strike mark was found on the stair railing on the lower stairs, and a strike mark was found on the victim's apartment's door frame. Fresh paint chips around the strike mark in the front door indicated that the mark was made recently.

Detective Robert Anderson with the Metro Nashville Police Department was responding to the call about the shooting when a second call came over the radio announcing that Mr. Woodland had arrived at Metro General Hospital seeking treatment for a gunshot wound to the leg. Mr. Creavalle told Detective Anderson that he could identify the man who struggled with the victim because the man's face was uncovered. Detective Anderson included Mr. Woodland's picture in a photographic lineup, and Mr. Creavalle identified Mr. Woodland as the intruder who had fought with Mr. Palmer. Mr. Woodland only identified Defendant by a nickname in his statement to the police.

Detective Anderson interviewed Defendant four days after the shooting, and summarized Defendant's statement as follows. Defendant initially said that he was driving with his friend, Shawn, when an unknown man flagged down his car. The man had been shot and asked Defendant to take him to the hospital. Later, Defendant admitted to Detective Anderson that he drove Mr. Woodland to the victim's apartment to buy marijuana. Defendant waited at the bottom of the stairs while Mr. Woodland went up the stairs to meet the victim. He saw Mr. Woodland pull out his gun. The two men began to struggle over the gun and rolled down the stairs. Defendant said he pulled out his gun also and pointed it up the stairs. He tried to fire it several times, but the gun was jammed. Defendant said he managed to clear the jam and fired once before he ran. Defendant said that he did not know what the bullet hit, if anything. Defendant could not remember whether he was carrying a nine millimeter or a .380 caliber gun, but knew that the gun was an automatic weapon. Defendant said that he took Mr. Woodland to the hospital and then threw his gun into a dumpster behind a barbeque restaurant.

The State then introduced Defendant's videotaped statement as an exhibit and played portions of the videotape in court. According to the videotape, Defendant said that neither he nor Mr. Woodland had any money, so Shawn gave them money to purchase the drugs. Mr. Woodland called the victim from Defendant's car on his cell phone and told him they were on their way to buy some marijuana. Defendant said that he had his gun in his coat pocket when he went into the victim's apartment building. Defendant said that he heard the victim and Mr. Woodland discussing the transaction, and then heard the words, "man, this ain't enough." At this point, Mr. Woodland drew his gun.

Defendant testified on his own behalf. He said that he bought a gun a few weeks before the incident for protection because his place of employment had been robbed. Defendant said that shortly before the incident, he left his house to pick up some barbeque. He saw his friend Shawn and another man on the street. Defendant said that he did not know the second man's name but later found out that he was Mr. Woodland. Mr. Woodland asked Defendant to take him to buy some marijuana, and Shawn indicated to Defendant that it was "all right." Mr. Woodland told Defendant to wait while he went to get his gun. Defendant said that it was not unusual to see someone carrying a gun for protection, and denied that he knew that Mr. Woodland was planning to use the gun during the drug purchase.

Defendant said that Mr. Woodland went into the victim's apartment building first. Defendant waited a short time and then went into the building so that Mr. Woodland would hurry up and finish

his transaction. As he approached the front door of the building, Defendant looked in a window and saw Mr. Woodland pull out his gun. Defendant said that he stood in the doorway so the two men would not see him. When the two men rolled down the stairs, Mr. Woodland's gun was pointed in his direction. Defendant said that he attempted to fire his weapon as a warning shot, but it jammed. He fired the gun one time after he cleared the jam.

Defendant admitted that he panicked because no one pulled a gun "in a regular deal," but continued to deny that he knew a robbery was taking place.

On cross-examination, Defendant admitted again that he knew "something [was] going on" when he saw Mr. Woodland's gun. Defendant said that as the victim and Mr. Woodland were conducting the "exchange," he saw the victim put something in Mr. Woodland's hand, and then Mr. Woodland "presented" his gun. Defendant said that he did not know what happened to Mr. Woodland's gun or his walkie-talkie.

## II. Sufficiency of the Evidence

Defendant argues that there was no evidence to support the jury's finding that a robbery or an attempted robbery had occurred during the incident. Alternatively, Defendant contends that even if Mr. Woodland had robbed or attempted to rob Mr. Palmer, there was no evidence to support a finding that Defendant intended to promote or assist in the commission of the offense. The State contends that the evidence supports a finding that an attempted robbery occurred, and that Defendant at least was criminally responsible for the victim's death.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Felony first degree murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202(a)(2). In order to support Defendant's conviction for felony murder, the State must prove that a felony was committed,

namely an attempted robbery, that Mr. Palmer was killed during the commission of the felony, and that Defendant either committed the felony murder himself or he was criminally responsible for Mr. Woodland's actions. *See State v. Cureton*, 38 S.W.3d 64, 73 (Tenn. Crim. App. 2000) (Evidence sufficient to support Defendant's conviction under either theory.)

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . acts with intent to complete a course of action or cause a result that would constitute the offense under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* 39-12-101(a)(3). The intent to commit the underlying felony may be formed "concurrent with the commission of the act causing the death of the victim." *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). Such intent may be inferred from the defendant's actions. *Id.* at 108.

Defendant first argues that the State did not present any evidence that a robbery or attempted robbery occurred. The evidence, however, established that Defendant drove Mr. Woodland to the victim's apartment building to buy marijuana. Both Defendant and Mr. Woodland armed themselves before arriving at the victim's apartment. Mr. Woodland and the victim conversed for two or three minutes while Defendant waited at the bottom of the stairs in front of the building's only exit. Defendant said that the victim put some "stuff" in Mr. Woodland's hands, Defendant heard the words, "man this ain't enough," and then Mr. Woodland drew his gun. Mr. Creavalle testified that Defendant pointed his gun up the stairwell while the victim and Mr. Woodland struggled for possession of Mr. Woodland's gun. Mr. Woodland told Defendant to shoot the victim, and Defendant attempted to fire his gun. When his gun failed to discharge, Defendant worked to clear the jam, and then fired in the direction of the victim. The victim's neighbor saw two men exit the building after the shots were fired. Defendant drove Mr. Woodland to the hospital, and then disposed of his weapon in a dumpster.

There was no evidence as to which man fired the fatal shot to Mr. Palmer's chest, and no guns were found. The evidence is sufficient, however, to support a jury's finding that an attempted robbery occurred, that Defendant was an active participant in the attempted robbery, and that Defendant was therefore "accountable for all consequences flowing from the [attempted] robbery." *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000). Holding a gun on the victim as the victim wrestled with Mr. Woodland and then discharging his weapon at the victim constitutes a substantial step toward the commission of a robbery. *See State v. Webster*, 81 S.W.3d 244, 249 (Tenn. Crim. App. 2002)("Defendant's conduct in approaching the victim and pointing a gun at the victim's head constituted a substantial step toward the commission of an especially aggravated robbery.") "When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." *State v. Winters*, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003) (citing *Hinton*, 42 S.W.3d at 119). In such a situation, both defendants are "statutorily responsible for *all*

-5-

*homicides* committed during the course of the robbery, whether or not the homicide was foreseeable." *Winters*, 137 S.W.3d at 659 (emphasis in original.).

Alternatively, even if the jury concluded that Defendant was not a principal offender, the evidence was sufficient for a jury to conclude beyond a reason doubt that Defendant was criminally responsible for Mr. Woodland's conduct. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). A person may be convicted under a criminal responsibility theory regardless of whether or not he or she "directly participated in the criminal act itself." *State v. Mickens*, 123 S.W.3d 355, 391 (Tenn. Crim. App. 2003)(quoting *State v. Phillips*, 76 S.W.3d 1, 12 (Tenn. Crim. App. 2001)).

Once again viewing the evidence in a light most favorable to the state, the evidence is sufficient to support a jury's finding that Defendant intended to assist in the commission of the robbery. Regardless of whether the transaction started out as a "regular" drug purchase as Defendant insists, Defendant admitted he was aware that the situation changed when Mr. Woodland drew his gun. Defendant did not leave the premises even though he was standing by the building's exit. Instead, when Mr. Woodland called out to "shoot him, shoot him," Defendant drew his weapon and attempted to fire the gun. When his gun failed to discharge, Defendant did not abandon the weapon, but proceeded to clear the jam. He then fired the gun in the direction of the victim as the victim attempted to escape the struggle. Following the shooting, Defendant drove Mr. Woodland to the hospital and assisted him into the emergency room. He then drove to a restaurant and threw his gun away in a dumpster behind the building. This Court has previously noted that "presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *Phillips*, 76 S.W.3d at 9 (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)).

We recognize that Defendant strenuously denied any knowledge of the robbery or Mr. Woodland's intentions. Although Defendant offered an explanation for his conduct before and after the shooting, it was the jury's prerogative to draw what inferences it chose from the testimony and ultimately discredit Defendant's testimony. Viewing the evidence in a light most favorable to the state, the evidence is sufficient to support Defendant's conviction of first degree felony murder based upon a theory of criminal responsibility.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-6-