# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2014

## STATE OF TENNESSEE v. JOSHUA JONES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 12-03532      Lee V. Coffee, Judge**

---

**No. W2013-02119-CCA-R3-CD  - Filed February 25, 2015**

---

A Shelby County Criminal Court Jury convicted the appellant of the aggravated assault of Jack Austin.  The trial court sentenced the appellant as a Range II, multiple offender to ten years in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Ted I. Jones, Memphis, Tennessee, for the appellant, Joshua Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Susan Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's conviction stems from the December 16, 2011 beating of the victim, Jack Austin.  At trial, the victim testified that in December 2011, he was fifty-eight years old. The victim's eighty-two-year-old mother and sister lived in the area of Orleans and Regent, and the victim "stay[ed]" with them.  Sometime between 7:00 and 9:00 a.m. on December 16, the victim saw a young man he knew as "Little Will," whom he had paid fifteen dollars to mow his mother's yard.  The victim approached "Little Will" and asked him about the money because the yard had not been mowed.  "Little Will" responded, "'I thought you were

going to ask me that," then he told the victim to "'[h]old on a minute.'" After the victim turned to walk away, "Little Will" ran to a house on the hill, put on his shoes, and "came back out."

The victim said that as he was walking away, he heard the sound of running feet and turned around. He saw a group of young men, including "Little Will," "Dave," and the appellant, coming from the hill. "Little Will" tried to hit the victim but missed, and the victim hit him. The victim turned to face the rest of the men, and they "started rushing" him. One of the young men stepped on the victim's foot, breaking his ankle. The victim fell to the ground, and the young men "commenced to beating" him. The victim said that the group of young men

> included [the appellant], but I'm going to state this just like this here: For the record, he was there, but by me being on the ground and all these people are beating me, he could have backed out, but I ain't going to say he backed out. Because when a bunch of people are on top of you, you cannot say someone did not hit you.

The victim said that several men participated in the beating but that he was unable to identify them individually. He said that all of the men were kicking and beating him.

The victim said that after five or six minutes, Cheryl Marty drove up in a truck, and the young men stopped beating him. Marty called 911 and stayed with the victim until the paramedics arrived. While she waited, people threatened her and told her to leave and to mind her own business. The victim said that Marty was the only person who tried to help him.

After the incident, Sergeant Shawn Schafer showed the victim a photograph lineup, from which he identified the appellant. Sergeant Schafer attempted to discover the identities of the other young men involved; however, the police were unable to locate the assailants because they did not "have permanent living quarters." The victim knew some of the young men but only by their nicknames. He also knew the appellant's parents.

The victim said that after the beating, he was hospitalized for two weeks. He had six surgeries and anticipated more. Plates were put in his jaws and his chin, and seventeen pins were put in his ankle. He was trying to learn how to put pressure on his injured foot. He continued to have numbness on one side of his face and in order to eat, his food had to be put in a blender. He was unable to taste his food and had lost a lot of weight. Additionally, the injuries impaired his ability to speak.

On cross-examination, the victim said that he had known the appellant since the appellant was very young. Several days before the altercation, the victim saw "Little Will" walking down the street pushing a lawn mower. The victim asked what he would charge to mow the victim's yard, and "Little Will" responded that it would cost fifteen dollars. The victim gave "Little Will" the money, and "Little Will" said that he had to get gasoline before mowing; however, he never returned. The victim said that his sister asked "Little Will" why he had not mowed, and he threatened her and told her that if she said anything else, he would "shoot [her] mother's house up."

The victim said that a group of young men, including "Little Will" and the appellant, "r[a]n together." When questioned about why "Little Will" had to put on tennis shoes, the victim explained:

> These young guys have a theory. They have to put shoes – tennis shoes on before they approach you. I don't know what the tennis shoes thing is. They have to have them on. Even in jail, they do the same thing. . . . They always say, "Let me get my shoes."

The victim said that four young men were with "Little Will" when he ran toward the victim. When "Little Will" attempted to hit him, the victim ducked, avoiding the blow, then he struck "Little Will." The other young men "rushed" the victim and began beating him. During the scuffle, the victim broke his ankle and fell to the ground. The victim was unable to fight back after his initial blow struck "Little Will."

Defense counsel asked the victim if he saw the appellant hit him. The victim responded:

> You know what? I think about that same question. You know why? Because when I hit Little Will, when I hit the ground; everybody commenced to beat me. If you got a chance to just look up and see what's going, and you've got your jaw broken and everything, you can't tell everybody that's hitting you here and there. You can't see through a crowd, and you're on the ground.

The victim said that he believed all five men assaulted him. The victim could not recall specifically where each of the men hit or kicked him.

The victim said that after Marty broke up the fight, he saw all five young men,

including the appellant, retreating up the hill. The victim said that the appellant did not try to help him. When defense counsel asked what the victim thought the appellant did wrong, the victim responded, "He was affiliated and then, he knows exactly who it is, so then he won't tell who it is." Defense counsel asked if the victim was "sore" because the appellant did not "rat on" the people who beat the victim. The victim retorted, "I ain't sore about that. I'm sore because he was there. . . . I know when they came running off that hill, he was running with them. So if you run with a crowd, you are as much at fault as they are."

On redirect examination, the victim said that "Little Will" and the appellant had been "running together" for one or two years. He stated that when he turned after hearing footsteps, he "saw their faces, and they all were right in front of me, and Little Will was on this side. When he swung and I ducked and he missed and had hit him, then that's when everybody pounced on me. And when they stepped on my foot and I broke my ankle and I hit the ground; it was all over then."

Judd Rhodes, a firefighter and emergency medical technician (EMT) with the Memphis Fire Department, testified that in the early morning hours of December 16, 2011, he and fellow EMT Adam Fisher were dispatched to assist the victim. Rhodes said the victim was "an older black gentleman, . . . [maybe] sixty-ish." The victim reported that he had been "jumped" by several men and that his ankle hurt. Rhodes noticed that the victim's ankle was extremely swollen. The EMTs transported the victim to the hospital.

Adam Fisher[1] testified that he and Rhodes arrived at the scene around 9:00 a.m. The victim informed them that he was fifty-eight years old. The victim said that his jaw hurt, but Fisher did not notice "much deformity to his jaw," and the victim had no trouble speaking. The victim said that his ankle hurt, and Fisher noticed that the ankle was swollen, which was a sign of a possible fracture. The victim appeared to be in pain. The EMTs transported the victim to the Veteran's Administration (VA) Medical Center for treatment.

Officer Nathan Bell testified that on December 16, he was employed by the Memphis Police Department[2] and was dispatched to the scene. By the time he arrived, another officer and members of the fire department were there, and the victim had been placed in an ambulance. Officer Bell spoke with the victim, whose face and left ankle were swollen. The victim had difficulty talking and seemed dazed and confused. Officer Bell asked the victim about the appellant, who was at the scene. The victim "said that he saw him standing nearby when the assault was taking place, but he wasn't sure if he was involved or not." After

---

[1]Fisher testified by video deposition.

[2]At the time of trial, Officer Bell was employed by the Bartlett Police Department.

speaking with the victim, Officer Bell spoke with the appellant, who said that he witnessed the assault but took no part in it.

Memphis Police Sergeant Shawn Michael Schafer, Jr., testified that he was assigned to investigate the assault on the day of the offense. Sergeant Schafer showed the victim a photograph display, and the victim immediately identified the appellant as one of his assailants. The victim told the police the nicknames of the other assailants; however, the police were unable to locate them.

After the appellant was identified by the victim, Sergeant Schafer had the appellant brought to the police station for questioning. Sergeant Schafer advised the appellant of his Miranda rights, and the appellant agreed to the interview. The appellant said that on the day of the offense:

> he was inside his residence, and he hears a commotion outside, puts his shoes on, and runs outside to the group of people that are attacking [the victim]. And he's yelling as he runs up to the crowd. When he gets up to the crowd, he stops.

The appellant said that was the extent of his involvement. Sergeant Schafer said that the appellant did not name any of the victim's assailants initially; however, he later identified some of the perpetrators by their nicknames.

Sergeant Schafer said that the appellant's version of events was not credible, explaining that it did not make sense that the appellant could not identify any of the assailants when they were all from the same area. Additionally, Sergeant Schafer did not believe that the appellant would stop when he reached the crowd without doing more, especially because the appellant knew the victim. Sergeant Schafer decided to "test" the appellant by compiling a photospread that included a photograph of someone the appellant knew; he was not trying to get the appellant to implicate anyone in a crime, merely to identify the person as someone he knew. The appellant, however, pointed to a photograph of someone else. Sergeant Schafer told the appellant that he had "lost all credibility" and that he would be charged with aggravated assault. As he was being booked, the appellant said that he wanted to talk with Sergeant Schafer, but the sergeant told the appellant "it's too late, I'm charging you." Sergeant Schafer said that based upon the appellant's demeanor and the victim's statement, he felt certain the appellant was involved in the assault.

On cross-examination, Sergeant Schafer acknowledged that the victim could not say who inflicted specific injuries he received and that he could not specify any violent act

committed by the appellant. Sergeant Schafer asked the victim about his statement at the scene that he was unsure whether the appellant was involved in the assault. The victim responded that he was certain that the appellant was involved.

Sergeant Schafer said that he believed the appellant was guilty based on his lack of credibility. He questioned the appellant's explanation that he heard a commotion, put on his shoes, ran outside, went up to the group, stopped, and did nothing. He also considered that the appellant, when shown a photograph spread of someone Sergeant Schafer knew the appellant knew, the appellant denied knowing the person.

Cheryl Marty testified that on the morning of December 16, she was in her vehicle when she saw four men, one of whom was the appellant, in black hoodies with the hoods up gathered around someone lying on the ground. Marty stopped her vehicle and watched them as she reached into her purse for her cellular telephone. She did not believe the men noticed her. From the men's movements, Marty thought they were "intimidating or yelling at" the victim. The men turned around and walked in her direction, "laughing; almost celebrating." Marty saw the faces of the first two men. She watched all four men go into a nearby house.

Marty drove past the victim and noticed blood on his face. She continued driving to a house where she had been working earlier that morning and asked her co-workers for help. She returned to help the victim and called 911. At that point, two of the four men approached her. Marty asked the victim if those were the men who hurt him, and the victim said yes. Marty feared the men and asked the 911 dispatcher to send help. The men walked toward the victim, telling him to get up. They told Marty "that he was all right; that there was nothing to see here; that [she] needed to mind [her] own business." Marty said that the men were acting "[a]lmost like they wanted to make it go away. Almost like, now that the damage is done, they are trying to make it go away." Marty thought the men were trying to intimidate her, and she warned them that the police were on their way.

Marty said that the four men acted in concert the whole time, explaining that

> [e]ven when [all four were] facing [the victim], and didn't know
> that I was sitting there watching them, when one turned, the next
> one turned, the next one turned, and they followed in a line right
> at me; but they were laughing[,] . . . walking away from [the
> victim], laughing . . . [a]bout him laying on the ground.

Marty said that when the officers arrived, they asked who was involved in the assault, and she pointed at the appellant and another man. Marty stated that she got a clear look at the appellant because he was the first one to turn away from the victim and he walked

straight toward her.

Marty said that she ultimately left the scene because she felt her presence was "making it worse." She explained that she did not have many friends in the neighborhood because it was well-known that she did not tolerate "gang bangers" and that she thought the men were probably gang members based on how they were dressed.

On cross-examination, Marty said that the appellant was dressed like the other three men, in a black hoodie with the hood up. She denied seeing anyone hit the victim. She said, however, that "[t]here was motion between [the appellant] and the second guy. They were standing side by side, shoulder to shoulder. And there was motion between them. Can I say, was it the guy standing next to him or him; I don't know, because I was looking from behind." She stated that the appellant was the "first one" in the line.

Marty clarified that the appellant did not tell her to mind her own business; the comment came from the appellant's companion. The appellant was still at the scene, talking to an officer when Marty left.

The jury found the appellant guilty of aggravated assault, and the trial court imposed a ten-year sentence. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and

circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated assault as charged in the indictment occurs when a person intentionally or knowingly commits an assault and causes serious bodily injury to another. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i). A person commits assault when the person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). Serious bodily injury is defined as a bodily injury that involves:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is eight (8) years of age or less.

Tenn. Code Ann. § 39-11-106(a)(34); see also State v. Michael Farmer, 380 S.W.3d 96, 101-02 (Tenn. 2012).

The appellant argues that "there is no direct or circumstantial evidence that the [appellant] committed the acts required directly or indirectly to even potentially be convicted of [aggravated assault]." The appellant asserts that although he was there, "no one saw him do anything." The State maintains that even if the appellant did not hit the victim, he could be guilty of the charged offenses based on the theory of criminal responsibility.

In Tennessee, "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." Id.

at 171. The appellant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). "'[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred.'" Dorantes, 331 S.W.3d at 386 (quoting State v. Phillips, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001)); see State v. Pope, 427 S.W.3d 363, 369(Tenn. 2013). "[N]o specific act or deed need be demonstrated." Dorantes, 331 S.W.3d at 386. In fact, "[i]t is not necessary for one to take a physical part in the crime. Mere encouragement of the principal is sufficient." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998).

In the instant case, the proof adduced at trial revealed that the appellant and "Little Will" were together frequently and did things together. On the day of the offense, the victim asked "Little Will" about money he had been paid for a job he never performed. "Little Will" had threatened the victim's sister when she asked about the mowing, and "Little Will" was not surprised by the confrontation. According to the victim, "Little Will" left to get his tennis shoes, which was something "young guys" habitually did before "approach[ing]" someone. "Little Will" returned with three or four other young men, including the appellant. All of the young men were dressed alike, wearing black hoodies with the hoods up. "Little Will," who was upset about the fifteen dollars, ran up to the victim and tried to punch him, and the victim hit "Little Will." The other young men, including the appellant, "rushed" the victim; one of them stepped on the victim's foot, breaking his ankle. The victim fell to the ground, and the men began beating him. The victim said that all of the men were involved in the altercation. The victim did not know if the appellant hit him but knew the appellant was among the men who surrounded him. He explained that he was on the ground, attempting to protect himself from the beating, and could not see what each of the men were doing.

Cheryl Marty saw the young men gathered menacingly around the victim as he lay on the ground. The men appeared to be intimidating or yelling at the victim. The appellant was one of the men. Marty said that the appellant stayed with the group of men throughout the assault. As the young men left, they laughed about the assault. Afterward, the appellant and another young man returned to the scene and tried to discourage Marty from assisting the victim. Police later questioned the appellant, and he said that he witnessed the event and that he approached the group after the assault commenced, which was contrary to the version of events ascribed to by the victim and Marty. The victim underwent multiple surgeries, had plates put in his jaw and chin, and pins put in his ankle. As of the time of trial, he still had pain from the injuries. From the foregoing, we conclude that a reasonable juror could have determined that the appellant was acting in concert with the group of men who assaulted the

victim and that, even if he did not actually hit the victim, he was criminally responsible for the aggravated assault. See State v. Phillips, 76 S.W.3d 1, 10 (Tenn. Crim. App. 2001); State v. Ronnie Dobson and Milton Rance, No. W2010-02571-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 937, at *15 (Jackson, Dec. 22, 2011); State v. Justin Mathis, No. W2005-02903-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 592, at *38-40 (Jackson, July 20, 2007).

### III.  Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE