IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 26, 2020

**STATE OF TENNESSEE v. JOSHUA WILLIAMS**

**Appeal from the Criminal Court for Knox County**
**No. 103238B Bobby R. McGee, Judge**

_____

**No. E2019-01995-CCA-R3-CD**

_____

The Defendant, Joshua Williams, was convicted of two counts of especially aggravated burglary, four counts of attempted first degree murder, twelve counts of employing a firearm during the commission of a dangerous felony, four counts of aggravated assault, and two counts of felon in possession of a firearm and was given a total effective sentence of sixty-eight years. On appeal, he argues that the evidence was insufficient to support his convictions of attempted first degree murder. After thorough review, we disagree and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

J. Liddell Kirk (on appeal) and Thomas Slaughter (at trial), Knoxville, Tennessee, for the appellant, Joshua M. Williams.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On February 4, 2014, the Defendant, along with the co-defendant and an unidentified man, entered the male victim's apartment with firearms in an attempt to rob him. When the male victim, Aundre Buford, reached for the co-defendant's gun, the co-

defendant began shooting, and the male victim returned fire. There were also two women in the male victim's apartment when the shooting started, along with another man whom the Defendant and co-defendant had threatened and forced to assist in the burglary. The male victim and one of the women were shot during the incident. The Knox County Grand Jury indicted the Defendant on March 11, 2014, charging him with two counts of especially aggravated burglary, four counts of attempted first degree murder, twelve counts of employing a firearm during the commission of a dangerous felony, four counts of aggravated assault, and two counts of felon in possession of a firearm. Following a trial, the Defendant was convicted as charged in all twenty-four counts.

At the February 3-6, 2015 trial, Michael Alan Mays testified that he was the 911 records manager for the Knox County Emergency Communications District. He provided a copy of the 911 call that was placed on February 4, 2014.

Beth Goodman testified that she was employed as a Senior Evidence Technician with the Forensic Unit of the Knoxville Police Department ("KPD"). Ms. Goodman was called to the crime scene at Mr. Buford's apartment on February 4, 2014, to do a walk-through and photograph the scene. Several of the photographs taken by Ms. Goodman at the crime scene were admitted as exhibits, including photographs of a .45-caliber handgun and .40-caliber shell casings found in the parking lot, Mr. Buford's clothing on a balcony of the apartment, and a handgun magazine containing seven .45-caliber rounds on a coffee table inside the apartment. Ms. Goodman also collected a bullet that was removed from, the female victim, Macee Peterkin, during surgery from the hospital.

Rebecca Taylor testified that she was a KPD evidence technician and had assisted Ms. Goodman in processing the crime scene. Danielle Wieberg testified that she was also a KPD evidence technician and had assisted in processing the crime scene. Ms. Wieberg also photographed the Defendant while he was in the interview room and collected "all the items that he was wearing," including clear latex gloves that "fell out of" his pants pocket as he removed his clothing. Ms. Wieberg also collected buccal swabs from the Defendant. She affirmed that she helped search and process another apartment approximately two weeks after the incident and discovered an unfired .40-caliber bullet. Tiffany Hamlin testified that she was also a KPD evidence technician. She collected a .40-caliber shell casing from the crime scene apartment complex that was later recovered by maintenance staff.

Cheryl Greene testified that she was the custodian of medical records for the University of Tennessee ("UT") Medical Center where the shooting victims, Aundre Buford and Macee Peterkin, were treated following the incident. Athena Roberts testified that she was a trauma nurse in the UT Medical Center emergency room where Mr. Buford was taken following the shooting and had assisted in treating him. Wes Chamblee testified

that he was also a trauma nurse at UT Medical Center and had assisted in treating Ms. Peterkin.

Mr. Buford testified that in November 2013, he noticed his apartment had been broken into after returning from a trip to Memphis. He affirmed that he was selling marijuana at the time, but none was taken from his apartment. In December 2013, he was robbed at gunpoint by two acquaintances, including co-defendant Brandon Middlebrook, who stole marijuana and money from him. Following the robbery, Mr. Buford moved to a different apartment and ceased all contact with Brandon Middlebrook but did not stop selling marijuana. Mr. Buford stated that he knew Johnny B. McCamy as a "cool cat" who "used to come and buy weed" from him.

Mr. Buford stated that on February 4, 2014, he was at his apartment with Macee Peterkin and Janae Walker. Mr. McCamy texted him to "let [him] know he wanted to buy something." Mr. Buford let Mr. McCamy know that he was home, and Mr. Buford later heard someone knock on his apartment door. He asked who was there, but no one answered, and he could not see anyone when he looked outside through his blinds. He again asked who was there, and a voice that did not sound like Mr. McCamy answered, "Johnny B." Mr. Buford was "alerted" but "still opened the door." When he did, Mr. McCamy entered the apartment, and Brandon Middlebrook "tried to come in after him." Mr. Buford tried to prevent Mr. Middlebrook from entering the apartment, but Mr. Middlebrook "pulled out his gun and said, '[G]et on the ground, get on the ground.'" Mr. Buford then reached for the gun that he had on his hip, and Mr. Middlebrook "immediately started shooting." Mr. Buford "ran outside after the bullets [in his gun] ran out." He was "almost immediately shot again" after running outside. He testified that he was shot in his wrist and his leg while outside by a second shooter that he could not see. Mr. Buford then lay on the ground until police arrived. Ms. Peterkin and Ms. Walker sat next to him on the ground after Ms. Walker helped Ms. Peterkin exit the apartment. Mr. Buford also stated the Mr. McCamy immediately "got on the ground" after entering his apartment.

On cross-examination, Mr. Buford testified that he had never seen the Defendant before the day of the shooting and did not see the second shooter. He stated that Ms. Peterkin informed him that Mr. Middlebrook "stayed in the apartment" for a while, shooting Ms. Peterkin several times, before following Mr. Buford outside.

John McCamy testified that the Defendant played football with his older brother. Mr. McCamy knew Mr. Buford because he had previously sold Mr. McCamy marijuana. Mr. McCamy testified that on February 4, 2014, the Defendant called him and asked him to come to the Defendant's apartment. When Mr. McCamy arrived at the Defendant's apartment, the Defendant was there with "two other men[,] and they had guns on their laps." The two other men, one of whom was later determined to be Brandon Middlebrook,

- 3 -

then began to talk about "robbing somebody or going to get some money, because they were low on money[.]" The Defendant then began telling the two men that Mr. McCamy "knew Aundre [Buford] and that [Mr. McCamy] could get them inside his house." Mr. McCamy then told the others that he did not want to do that and stood up to leave, when Mr. Middlebrook "placed a firm hand on [Mr. McCamy] and had his gun in his hand and put [Mr. McCamy] back down and said that [Mr. McCamy] was going to call [Mr. Buford] and [Mr. McCamy] didn't have a choice[.]"

Following this interaction, the Defendant, Mr. Middlebrook, and the third man began cleaning their guns and "then put on rubber gloves and got bandanas and hoodies." They then "escorted [Mr. McCamy . . . out of the house," with two of the men behind Mr. McCamy and one in front of him with their guns drawn. The men had Mr. McCamy drive them to Mr. Buford's apartment after forcing him to tell Mr. Buford that he was coming to buy marijuana from him. Mr. Middlebrook rode in the passenger seat, while the Defendant and the third man sat in the backseat. When they arrived at Mr. Buford's apartment, the three men exited the car with "their guns drawn and masks up and hoodies up[,]" and they followed Mr. McCamy towards Mr. Buford's apartment. Mr. McCamy then knocked on the door, and Mr. Buford asked who was there. When Mr. McCamy responded, "John," Mr. Buford opened the door, and Mr. Middlebrook "busted in through the door[,]" and Mr. McCamy "went down to the fetal position, where [he] was laying there with [his] eyes shut. And [he was] absolutely terrified 'cause the shooting started immediately." Mr. McCamy testified that once the shooting stopped, he "panicked and started to run." He ran outside and did not see any of the three men, so he ran towards his car. However, the three men then "popped out of the alleyway near [him,] and they were screaming and yelling at [him] to get into the car." Mr. Middlebrook was bleeding, and the men told Mr. McCamy to drive to the hospital. The men were "yelling" and "threatening [Mr. McCamy's] life and [his] family's life." Mr. McCamy said that he was "very scared" because the Defendant knew where he lived and knew his family. Thus, Mr. McCamy did not go to the police after taking the three men to the hospital. Instead, Mr. McCamy went to a friend's house, cleaned the blood out of his car, and went home. Mr. McCamy testified that he later talked to his parents and a lawyer and subsequently gave a statement to police. Mr. McCamy also affirmed that the Defendant was the one who had suggested they target Mr. Buford.

On cross-examination, Mr. McCamy affirmed that he told police he had "jumped over Mr. Buford" on the way out of the apartment and "begg[ed] him not to shoot" him. Mr. McCamy testified that he told his parents the day after the shooting what had happened. He stated that he "deleted everything off his phone" and cleaned the blood from his car because if he had not done so, his parents would have found out, and they would have had to contact the police, putting their lives in danger. He also affirmed that in his statement to police, he said that Mr. Middlebrook had directed him "where to go and where to park."

Macee Peterkin testified that she was watching television with Janae Walker and Aundre Buford at his apartment on February 4, 2014. Ms. Peterkin recalled that there was a knock on the apartment door, and Mr. McCamy entered and "stepped to the side," where he "began to kind of get in the position . . . to cover his head." Seconds later, Mr. Middlebrook came through the apartment door with his gun drawn, saying, "[G]et on the floor." Mr. Middlebrook and Mr. Buford began to "tussle," and shots were fired seconds later. Ms. Peterkin testified that she was in the living room when she was first shot by Mr. Middlebrook. When he ran into Mr. Buford's bedroom, Ms. Peterkin tried to crawl to the bathroom to hide. Mr. Middlebrook saw her lying face down and "shot [her] several more times" before he ran out of the apartment. She saw Mr. McCamy run outside during the gunfire, and she recalled "hearing automatic gunfire" immediately when Mr. Buford ran out of the apartment. Ms. Peterkin then asked Ms. Walker to help her leave the apartment, and they encountered Mr. Buford lying "near the stairwell slumped over, shot, hurt." Ultimately, Ms. Peterkin was shot "eight to ten" times and still had a bullet lodged in her right lung and broken ribs at the time of trial. On cross-examination, Ms. Peterkin affirmed that she did not see the Defendant during or after the shooting.

Janae Walker's testimony largely echoed that of Ms. Peterkin. Ms. Walker testified that she was in Mr. Buford's apartment on February 4, 2014, when the shooting began. Ms. Walker recalled seeing an African-American male standing behind Mr. Middlebrook outside the apartment door, but she did not see the man's face. Ms. Walker hid in the kitchen and saw Mr. McCamy "huddled down on the floor" and heard Ms. Peterkin screaming. Once "it got quiet," Ms. Walker heard someone walking around the apartment and remained hidden. She then saw the person's shadow go outside and heard more shots outside "30 seconds later[.]" Once Ms. Walker was certain that the shots had subsided, she emerged to check on Ms. Peterkin. She found Ms. Peterkin bleeding on the floor, and Ms. Peterkin kept repeating, "I don't want to die." Ms. Walker recalled helping Ms. Peterkin off the ground and was "amazed" that they were able to make it outside. They encountered Mr. Buford outside "in a puddle of blood," and he repeatedly told them that he was sorry for what had happened. Ms. Walker was interviewed by police while Mr. Buford and Ms. Peterkin were transported to the hospital.

James Russell Davis II testified that he was a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI"). Agent Davis was accepted by the court as an expert in gunshot residue analysis. Agent Davis explained that "in theory," anyone who shoots a gun will have gunshot residue on their hands, but any covering, such as gloves, "would be a barrier between a weapon and the hands[.]" Agent Davis did not find gunshot residue on any of the swab samples that were collected from the individuals in this case but explained that seven hours had elapsed between the time of the shooting and when the swabs were collected, meaning that the gunshot residue "is just not going to be on the hands, or it's going to be reduced[.]"

Jennifer Millsaps testified that she was also a TBI special agent forensic scientist. Agent Millsaps was accepted by the court as an expert in serology and DNA analysis. She analyzed blood samples from the crime scene and found Mr. Middlebrook's DNA in blood samples left on the railing, brick landscaping, ground, and window outside Mr. Buford's apartment. Mr. Middlebrook's DNA was also found in footprints left at the apartment building, a Clorox wipes container, and the headrest on "the passenger side of the black Denali." Agent Millsaps also found multiple DNA profiles, including Mr. Middlebrook's, on a "Ruger P89." She was unable to determine to whom the other DNA profiles belonged. The serology report was introduced into evidence. On cross-examination, Agent Millsaps conceded that of the DNA profiles she was able to analyze, none matched the Defendant's DNA.

Charlie Lee testified that he was a KPD investigator assigned to the violent crimes unit. Investigator Lee observed first responders tending to Mr. Buford's and Ms. Peterkin's gunshot wounds when he first arrived at the crime scene. He also noticed shell casings immediately outside and leading into Mr. Buford's apartment. Investigator Lee observed a blood trail leading away from where Mr. Buford and Ms. Peterkin were, and he followed the trail away from the apartment, through a grassy area to an alleyway. Investigator Lee returned to the police department after leaving the crime scene, where he and KPD Investigator Chaz Terry conducted an interview with the Defendant. Investigator Lee identified the Defendant's Rights Waiver form, and a portion of his interview was played for the jury. During the interview, buccal swabs and clothing were collected from the Defendant, and his hands were tested for gunshot residue. Investigator Lee affirmed that February 14, 2014, Oak Ridge Police Department recovered a Ruger P89, a 9-millimeter pistol, from a walking trail and turned it over to the KPD. He identified the .40-caliber shell casing that was found by maintenance near Mr. Buford's apartment. A search of the Defendant's apartment revealed "one single round of a .40-caliber . . . bullet and cartridge[.]" Investigator Lee affirmed that he conducted a second interview with the Defendant, which included "a lot of changes" from the version of events he gave in his first interview with police. On cross-examination, Investigator Lee conceded that the Defendant never confessed to or was identified as being one of the shooters, and gunshot residue was not found on his hands after testing. He also affirmed that there was "another young friend" of Mr. Buford's with him when Investigator Lee arrived at the crime scene.

Lisa Knight testified that she was the director of the Tennessee Department of Safety and Homeland Security handgun unit. Ms. Knight affirmed that the Defendant did not have a handgun carry permit and had never applied for such. Following Ms. Knight's testimony, the parties stipulated that the Defendant had a "prior conviction for violence and force."

Patricia Resig testified that she was a KPD firearms examiner. Ms. Resig was accepted by the court as an expert in firearms examinations. She testified that all five of the 9-millimeter shell casings that were recovered from Mr. Buford's apartment had the same "class characteristics." Ms. Resig also explained that the nine .45-caliber shell casings that were recovered from the victim's apartment were all fired from Mr. Buford's .45-caliber Kimber handgun. Ms. Resig testified that the eight .40-caliber shell casings that were recovered had all been fired from the same unknown handgun, and all eight casings had markings consistent with being fired from a Glock pistol. Ms. Resig also explained that there were five other casings that were ".40 Smith & Wesson caliber" that had "similar characteristics" to the other eight .40-caliber casings. She stated that "it could be possible that two .40[-]caliber . . . Glock-type firing pins were possibly at the scene." Ms. Resig identified several other bullet fragments recovered from the crime scene that had originated from the Kimber .45- caliber handgun, the 9-millimeter Ruger handgun, and the unknown .40-caliber handgun.

On cross-examination, Ms. Resig clarified that it was possible that there was only one .40-caliber handgun at the scene but more likely that there were two unknown .40-caliber handguns used in the shooting.

After the State rested, the Defendant made a motion for a judgment of acquittal, which the court denied. The Defendant elected not to testify on his own behalf and was convicted as charged after the close of all proof. Following a sentencing hearing, the trial court merged the two especially aggravated burglary charges and imposed an eight-year sentence; merged the four employing a firearm during the commission of a dangerous felony convictions that corresponded to the burglary convictions and imposed a ten-year sentence; merged the four attempted murder convictions into two convictions, for Mr. Buford and Ms. Peterkin, respectively, and imposed a fifteen-year sentence for each; merged the eight employing a firearm during the commission of a dangerous felony convictions that corresponded to the attempted murder convictions into two convictions and imposed a ten-year sentence for each; merged the four aggravated assault convictions into two convictions and imposed an eight-year sentence for each; and merged the two felon in possession convictions and imposed a three-year sentence. The court imposed a total of effective sentence of 68 years with partial consecutive sentencing.

The trial court granted partial relief on the Defendant's motion for new trial following a hearing on the motion. The trial court reduced the especially aggravated burglary convictions to aggravated burglary, imposed a three-year sentence for each of the aggravated burglary convictions, and reduced the imposed sentence for the employing a firearm during the commission of a dangerous felony convictions that corresponded to the attempted murder convictions to six years. This timely appeal followed.

# ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence with respect to his convictions for attempted first degree murder.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense," acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a), (a)(2).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." State v. Phillips, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

The Defendant asserts that the State failed to demonstrate that he possessed the requisite intent to commit attempted first degree murder.[1] The State responds that the

[1] We note that the Defendant also argues that his convictions for aggravated assault, see Tenn. Code Ann. § 39-13-102, were wrongfully classified as Class B, rather than Class C, felonies. However, the record

Defendant was convicted under a theory of criminal responsibility and that the evidence is sufficient to support his convictions for attempted first degree murder. We agree with the State.

Viewed in the light most favorable to the State, the evidence shows that the Defendant suggested Mr. Buford as a robbery target. Mr. McCamy tried to leave but was prevented from doing so. The Defendant, Mr. Middlebrook, and an unknown man donned gloves, bandanas, and hoodies. The trio then forced Mr. McCamy at gunpoint to arrange a meeting with Mr. Buford and to drive them to Mr. Buford's apartment. Once at the apartment, Mr. McCamy, Mr. Middlebrook, and the unknown man knocked on Mr. Buford's apartment door. Mr. McCamy entered and immediately huddled on the floor, and Mr. Buford tried to prevent Mr. Middlebrook from entering his apartment. Once Mr. Middlebrook forced his way inside, Mr. Buford reached for the gun on his hip, and Mr. Middlebrook began firing his own weapon. Mr. Buford returned fire. Once his ammunition was depleted, Mr. Buford ran outside. Ms. Peterkin and Ms. Walker remained inside the apartment. Once outside, Mr. Buford was shot from the parking lot of the apartment by a man he could not see. In total, he was shot twice in the arm and three times in the leg.

During the shooting, Ms. Walker was in the apartment's kitchen, while Ms. Peterkin was in the living room. When Ms. Peterkin tried to crawl to the bathroom to hide from Mr. Middlebrook, he shot her twice. He shot her several more times while she was lying face down on the floor. Mr. Middlebrook shot Ms. Peterkin at least eight times. Once the shooting was over, Ms. Walker helped Ms. Peterkin outside. Mr. McCamy ran from the Defendant, Mr. Middlebrook, and the unknown man. They found him and forced him to drive to the hospital for assistance with Mr. Middlebrook's gunshot wounds. The trio threatened Mr. McCamy and Mr. McCamy's family as they left his car.

The Defendant argues that "not one single witness" testified that the Defendant entered Mr. Buford's apartment or fired a weapon, and there is no evidence to suggest that the Defendant possessed an intent to murder Mr. Buford or Ms. Peterkin. The Defendant also asserts that "he could not be criminally responsible for Mr. Middlebrook's intent to commit any crime beyond a burglary and/or robbery of Mr. Buford" without explanation. Despite these assertions, we conclude that the evidence is sufficient to support the Defendant's convictions for attempted first degree murder under a theory of criminal responsibility for the conduct of Mr. Middlebrook. The evidence supports a determination that the Defendant knowingly and voluntarily shared in the criminal intent of the crimes

---

reflects that the Defendant was indicted and convicted for aggravated assault acting in concert, a Class B felony. See Tenn. Code Ann. §§ 39-12-302(a); 39-13-102(e)(1)(A).

- 10 -

and promoted their commission. As we have laid out, the Defendant suggested Mr. Buford as a burglary target, donned gloves and a mask, cleaned his gun, and went with Mr. Middlebrook and the unknown man to Mr. Buford's apartment, forcing Mr. McCamy to join them. Following the shooting, the trio forced Mr. McCamy to drive to the hospital for help with Mr. Middlebrook's gunshot wounds, and the Defendant exited the vehicle with Mr. Middlebrook and threatened Mr. McCamy and his family. The jury could have reasonably inferred from the Defendant's conduct before and after the commission of the offenses that the Defendant acted with the intent to assist in the burglary, which resulted in the attempted murder of Mr. Buford and Ms. Peterkin. See Maxey, 898 S.W.2d at 757. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE