IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2024

**STATE OF TENNESSEE v. ANTONIO D. GAUSE A/K/A BEBOP**

**Appeal from the Circuit Court for Lauderdale County**
**No. 11273     A. Blake Neill, Judge**

———————————————————

**No. W2023-00617-CCA-R3-CD**

———————————————————

The Defendant, Antonio D. Gause, was convicted by a Lauderdale County Circuit Court jury of two counts of first degree felony murder under alternate theories; especially aggravated robbery, a Class A felony; and accessory after the fact, a Class E felony. After merging the felony murder convictions, the trial court sentenced the Defendant to concurrent terms of life imprisonment for the first degree felony murder conviction, twenty-five years for the especially aggravated robbery conviction, and two years for the accessory after the fact conviction, for an effective sentence of life imprisonment in the Tennessee Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence in support of his convictions. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and KYLE A. HIXSON, JJ., joined.

Jeremy T. Armstrong, Dyersburg, Tennessee (on appeal and at trial), and Bryan Huffman, Covington, Tennessee (at trial), for the appellant, Antonio D. Gause.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Mark Davidson, District Attorney General; and Julie Pillow and Harrison Hight, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# FACTS

This case arises out of the Defendant's participation with Co-Defendant Terry Lee Johnson in an April 21, 2019 robbery and shooting at a Ripley home, which resulted in the death of William Greg Black ("the victim"), and the serious injury of Black's fiancée, Ashley Heflin.[1] According to the State's proof at trial, the Defendant's role consisted of planning the robbery with Co-Defendant Johnson, driving him to and from the scene, and sharing in a bag of marijuana that Co-Defendant Johnson carried from the home after the shooting. The Lauderdale County Grand Jury returned an eleven-count indictment against Co-Defendant Johnson and the Defendant in which the Defendant was charged in count two with the first degree felony murder of the victim during the perpetration of or attempt to perpetrate a robbery, in count three with the first degree murder of the victim during the perpetration of or attempt to perpetrate a theft, in count four with the especially aggravated robbery of the victim, and in count eleven with accessory after the fact. Prior to the Defendant's trial, Co-Defendant Johnson pled guilty to several counts of the indictment in exchange for an effective life sentence in the Tennessee Department of Correction.

The State's first witness at the Defendant's February 2023 trial was the victim's brother, Blake Black, who identified a photograph of the victim and Ms. Heflin and testified that the last time he saw the victim was the night of April 21, 2019, when he briefly visited him at the home of Ja'Kee Craig.

Sergeant Matthew Williams of the Ripley Police Department, who responded to Mr. Craig's 911 call about the shooting, testified that he found the victim and Ms. Heflin suffering from apparent gunshot wounds in the living room of Mr. Craig's residence on Church Street. He said that he and his fellow officers cleared the residence and called EMS, which transported Ms. Heflin to the hospital and determined that the victim was deceased. When he arrived at the scene, the victim was in a seated position on the couch with a video game controller in his hand, and Ms. Heflin was lying across the victim's body. On cross-examination, he testified that the officers found a jar of what appeared to be marijuana in a back bedroom of the residence.

Tennessee Bureau of Investigation ("TBI") Special Agent Justin Tubbs, who processed the crime scene, identified a crime scene sketch he had prepared that showed the location of the victim's body and various items of evidence collected from the scene. Among items found in the living room was a cartridge casing on the living room floor, a small jar of marijuana inside a trash can, a baggy of marijuana in the corner of the couch, and a vacuum sealer on the floor near a wall. In one of the bedrooms of the house was a

---

[1] We recognize that Ms. Heflin is also a victim in this case. However, for simplicity's sake, we will refer to Mr. Black as "the victim" and Ms. Heflin by her name.

large jar of marijuana and a zipped backpack with apparent blood on it. Hidden inside a cardboard bread box inside the freezer portion of the kitchen refrigerator was $4,400 in cash.

Agent Tubbs testified that the homeowner identified the shooter as Co-Defendant Johnson before Agent Tubbs arrived on the scene. Upon investigation, Agent Tubbs learned that Co-Defendant Johnson was a registered sex offender on active probation with the Tennessee Department of Correction, and that his probation officer had received a "master tamper" report on Co-Defendant Johnson's ankle monitor, which indicated that it had been removed.[2] He also learned that Co-Defendant Johnson had been traveling in a black Dodge Charger, which was subsequently discovered in the possession of the Defendant, who was known as "Bebop."

On cross-examination, Agent Tubbs testified that he received information that Mr. Craig had moved the blood-stained backpack from the living room to the bedroom. He said he did not know why Mr. Craig moved the backpack and never determined who owned blood-stained socks that were hanging on a hand-rail outside the home. He stated that he learned from witnesses that "Bebop" was the Defendant's street name.

TBI Special Agent Kim Covington, who responded to the crime scene in the early morning hours of April 22, 2019, testified that she assigned Agent Tubbs to process the scene and then went to the Ripley Police Department to start interviewing witnesses, including the homeowner, Ja'Kee Craig; Shundedra Wynn, who was Co-Defendant Johnson's sister; and Sharonda Treadway, who was Co-Defendant Johnson's wife. From these witnesses, Agent Covington learned that the Defendant had been in Co-Defendant Johnson's black Dodge Charger and that the Dodge Charger and Co-Defendant Johnson might be located at the Defendant's residence on Stardust Drive. When officers went to the Defendant's residence, they found the Defendant and the Dodge Charger, but not Co-Defendant Johnson.

Agent Covington testified that she had the Defendant brought to the Ripley Police Department for an interview. During that interview, the Defendant admitted that he occasionally rented Co-Defendant Johnson's Dodge Charger but denied any knowledge of the crimes. However, he said he knew where Co-Defendant Johnson had been dropped off in Halls, and he took a TBI agent to that address. Agent Covington said that during the time that officers were attempting to locate Co-Defendant Johnson in Halls, Co-Defendant Johnson was turning himself in at the sheriff's department, where he confessed to the murder of the victim and the attempted murder of Ms. Heflin. As a result, an indictment was returned charging Co-Defendant Johnson for the crimes.

---

[2] Co-Defendant Johnson did not remove his ankle monitor until after the crimes.

Agent Covington's next steps were to subpoena Co-Defendant Johnson's and the Defendant's cell phone records and to execute a search warrant for Co-Defendant Johnson's black Dodge Charger. The search of the Dodge Charger uncovered a vacuum-sealed package of marijuana on the driver's side dashboard and a blue Samsung cell phone in the center console, which belonged to Co-Defendant Johnson's wife but was being used by Co-Defendant Johnson at the time of the victim's murder. Agent Covington testified that two days prior to the shooting, on April 19, 2019, the Defendant sent three text messages to the number associated with the blue Samsung phone. The first text message was sent at 8:34:07 p.m. and read, "So how much money is you going to give me when I get back[.]" The second text message, sent at 8:34:55 p.m., read, "I can't hear you[.]" The third text message, sent at 8:35:21 p.m., read, "Hello[.]"

Agent Covington testified that on April 21, 2019, the day of the murder, Co-Defendant Johnson sent the Defendant a text message at 8:26 p.m. that read, "I need you family, frfr." She explained that "frfr" meant "[f]or real, for real." At 9:32 p.m., Co-Defendant Johnson sent the Defendant a text message that read, "Yo, I am ready to pull that move." Agent Covington stated that three audio messages from Co-Defendant Johnson to the Defendant followed, time-stamped 9:33:12 p.m., 9:33:20 p.m., and 9:33:34 p.m. She identified the CD of the audio messages, which was admitted as an exhibit and published to the jury. The first audio message was, "Yo, It's sweet, I'm ready." The second audio message was, "Call me, fam." The third audio message was, "I just went over there, It's real, sweet." Agent Covington testified that she recognized the voice on the audio messages as Co-Defendant Johnson's. She said there was a total of thirty-four calls from Co-Defendant Johnson to the Defendant on the day of the murder.

Agent Covington testified that she obtained search warrants for the locations of Co-Defendant Johnson's and the Defendant's cell phones for confirmation that the two men "were together before, during, and after the murder." After she received the location report, she requested that the district attorney add the Defendant to the previously returned indictment. The Defendant was arrested on February 3, 2020, and that same day she interviewed him again. In the February 3 interview, the Defendant admitted that he had received the audio messages from Co-Defendant Johnson but claimed he could not remember the messages. The Defendant also admitted that "a move" to him meant stealing, but he maintained that he had no knowledge of the victim's murder.

Agent Covington testified that they were about to take the Defendant to jail upon the completion of the February 3 interview when the Defendant asked to talk to them again. At that point, the Defendant admitted that Co-Defendant Johnson had been talking for "a while" about committing the theft. The Defendant also admitted that he had been in possession of the Dodge Charger, but he denied having been at the crime scene. The

Defendant instead told the investigators that Co-Defendant Johnson had driven himself to the crime scene and then driven to the Defendant's house with a bag containing marijuana. The Defendant told the investigators that he had paid Co-Defendant Johnson $275 for some of the marijuana.

Agent Covington testified that she spoke with the Defendant again on February 10, 2020, after the Defendant reached out to the jail administrator to request another meeting with the TBI. She identified the Defendant's signed waiver of rights and the recording of the February 10 interview, which was admitted as an exhibit and played for the jury. In the recorded interview, the Defendant admitted that he knew of Co-Defendant Johnson's plans to commit a robbery and said he had dropped Co-Defendant Johnson off near the home, waited at a close location, and picked him up after the robbery and taken him to the Defendant's home. The Defendant insisted he had no knowledge that Co-Defendant Johnson planned to shoot anybody, telling the investigators that he thought Co-Defendant Johnson was just going to grab the marijuana and leave. The Defendant said that Co-Defendant Johnson got back into the Dodge Charger holding a bookbag and his gun and announced that he had just killed the victim and the victim's girlfriend. The Defendant indicated he was shocked that Co-Defendant Johnson had killed the couple and feared that Co-Defendant Johnson was going to shoot him as well. However, he again stated that he bought some of the marijuana from Co-Defendant Johnson and that he drove him to the Defendant's home on Stardust Drive after the robbery. During the interview, the Defendant also mentioned that an individual by the name of Spinyatta Edwards was with him in the Dodge Charger as he waited for Co-Defendant Johnson to complete the robbery. The Defendant denied that he was the individual who had later returned to Mr. Craig's home, killed Mr. Craig's dogs, and searched the home for the cash Mr. Craig had hidden in the home.

Agent Covington testified that they interviewed Spinyatta Edwards "a couple of times[,]" spoke to witnesses, and analyzed his cell phone location data, but they were never able to determine that he had any involvement in the crimes.

On cross-examination, Agent Covington acknowledged that there was no frame of reference for the text the Defendant sent Co-Defendant Johnson asking how much Co-Defendant Johnson was going to give him. When asked if she had any proof that the Defendant answered any of the numerous calls that Co-Defendant Johnson made to his cell phone on the day of the murder, she cited the length of several of the calls but then said that it was a question best directed to the technical specialist who extracted the information from the phone. She said that the Defendant at one point in the interviews referred to Co-Defendant Johnson's committing a robbery and at another point called it "stealing." She added, however, that the Defendant told them that he saw Co-Defendant Johnson exit the

vehicle prior to the crimes while holding a gun in his hand. She stated that they were unable to fully determine one way or the other whether Spinyatta Edwards was involved and pointed out that charging decisions were the responsibility of the district attorney. Finally, she acknowledged that Mr. Craig was the father of Co-Defendant Johnson's sister's baby.

Federal Bureau of Investigation ("FBI") Special Agent Jennifer Banks, supervisor of the FBI's "CAST" or Cellular Analysis Survey Team and an expert in the field of historical cell site analysis, identified the report she had prepared based on her analysis of the cell phones that the Defendant and Co-Defendant Johnson were using on the night of the murder and the data from Co-Defendant Johnson's ankle monitor. The report was then admitted as Exhibit 20 and published to the jury. Agent Banks used a PowerPoint presentation as she provided detailed testimony to explain the technology and the information contained in her report. Among other things, she testified that the ankle monitor's GPS data showed that its wearer was at the location of the shooting, left and went to Stardust Drive, returned to the location of the shooting, and then left again and went back to Stardust Drive before departing the area. She agreed that the cell phone and ankle monitor data supported the conclusion that Co-Defendant Johnson and the Defendant were traveling together on the night of the murder: "Yes. Sort of a rival [sic] to Stardust and a leave - - they didn't travel together at the very beginning, but the ankle monitor appears to pick up the green phone [the Defendant's cell phone], depart, go to Ripley, return, potentially return to that address and then depart the area."

On cross-examination, Agent Banks acknowledged that the cell phone location data was not as precise as the ankle monitor's GPS data and that the Defendant could have been "anywhere within a couple miles" of Mr. Craig's house at the time of the shooting.

Crystal Crowder, a 911 dispatcher, identified a CD of Mr. Craig's 911 call about the shooting, which was admitted as an exhibit and published to the jury.

Ashley Renee Heflin testified that she and the victim were visiting Mr. Craig at his Church Street home on the night of April 21, 2019, when Co-Defendant Johnson came to the house. She stated that Co-Defendant Johnson kept repeating that he had a job to do, and that he asked if either Mr. Craig or the victim had a gun he could possibly use. She said that Mr. Craig did not have a gun, but the victim did, and when Co-Defendant Johnson asked to see it, the victim unloaded it before handing it over. Co-Defendant Johnson appeared upset that the victim had unloaded the gun and wanted to know why he had done that. The victim responded that he could not trust anyone and that he was not about to give Co-Defendant Johnson a loaded gun. Co-Defendant Johnson looked at the gun for a few minutes, handed it back to the victim, and left the house.

Ms. Heflin testified that Co-Defendant Johnson returned to the house "a little while later and . . . produced a handgun." She recalled that Co-Defendant Johnson had the victim look at the gun and also mentioned to the victim that it had a hairpin trigger. Co-Defendant Johnson then stepped outside to smoke a cigarette. Mr. Craig let his dogs outside and was outside on the porch when Co-Defendant Johnson came back inside and sat on the sectional sofa with Ms. Heflin and the victim. A few minutes later, Co-Defendant Johnson got up, walked to the end of a table, raised his gun, and shot the victim in the head before turning his gun toward Ms. Heflin and shooting her in the head as well.

Ms. Heflin testified that Co-Defendant Johnson ran outside, that she heard three or four more gunshots, and that she thought Co-Defendant Johnson had killed Mr. Craig. She said when she heard Co-Defendant Johnson coming back inside, she laid across the victim's lap because she did not want Co-Defendant Johnson to know that she was still alive. When Co-Defendant Johnson reentered, he grabbed a black duffle bag of marijuana and ran back outside with it. She said she had seen both the victim and Mr. Craig with the duffle bag in the past and did not know for certain which one of them owned it.

Ms. Heflin estimated that approximately twenty or thirty minutes elapsed from the time that Co-Defendant Johnson left the house after asking the victim for the victim's gun before returning with his own gun. She said she did not know how Co-Defendant Johnson got to the house. She stated that the bullet that struck her went through her eye and the roof of her mouth and lodged in her shoulder, and that she lost her eye, had to have her orbital bone reconstructed, and was left with permanent nerve damage in her arm.

On cross-examination, Ms. Heflin testified that, to her knowledge, Co-Defendant Johnson was alone both times that he came to Mr. Craig's house. She affirmed that she did not know how he arrived to the house and said that she never heard him mention the Defendant's name.

Ja'Kee Craig testified that the victim and Ms. Heflin were visiting him at his Church Street home when Co-Defendant Johnson came to the house asking if he had a gun. He told Co-Defendant Johnson no, and Co-Defendant Johnson then asked the victim about the victim's gun, but the victim would not let him use it. Co-Defendant Johnson left but returned fifteen or twenty minutes later with a gun. Co-Defendant Johnson asked the victim for a cigarette, and the victim gave him one. Mr. Craig thought he recalled that Co-Defendant Johnson cocked his gun and the victim responded by pulling out his own gun and cocking it. Co-Defendant Johnson asked the victim why he had done that, and the victim replied that Co-Defendant Johnson knew how things were and that he had to be careful.

Mr. Craig testified that Co-Defendant Johnson went outside to smoke, and the victim got up and locked the door behind him. Co-Defendant Johnson knocked to be let back inside, and after they let him in, Mr. Craig took his dogs out. Mr. Craig testified that he was standing on the porch calling his dogs back inside when he heard "pow pow" and looked over to see Co-Defendant Johnson shooting the victim and Ms. Heflin. At that point, he fled across the street to his neighbor's yard, where he used his cell phone to first call his baby's mother, who was Co-Defendant Johnson's sister, and then 911. Afterward, he walked back to his house and waited for the police. He said he saw some marijuana on the floor, which he moved. He did not recall having moved the backpack of marijuana from the living room to the bedroom but said it was possible he had.

On cross-examination, Mr. Craig acknowledged that he told the police that Co-Defendant Johnson, who was "acting strange[,]" asked to borrow some money. He also acknowledged that he did not see the actual shooting and did not know "who, if anyone, pulled first[.]" He said he did not know how Co-Defendant Johnson arrived to or left his house and that the Defendant's name was never mentioned.

The autopsy report, which reflected that the victim's cause of death was a gunshot wound to the head and the manner of death was homicide, was admitted as an exhibit by stipulation of the parties.

TBI Special Agent Adam Mathis, who was accepted by the trial court as an expert in the field of digital forensics, testified that he performed an extraction on Co-Defendant Johnson's cell phone using the Cellebrite program. Referring to previously admitted Exhibit 20, he testified that the number identified as the Defendant's phone number was saved in the cell phone under the name "Bop." He said that five and seven second phone calls reflected on Exhibit 20 could indicate either that those phone calls failed to go through or that the calls went straight to voicemail. He stated that the phone call with a duration of five minutes and thirty-eight seconds indicated to him that the call was answered and explained that AT&T has a voicemail limit of four minutes. He said he could not determine whether the phone calls that lasted for less than four minutes were answered. On cross-examination, he acknowledged that there were no "read receipts" on his extraction report to indicate that a text message was read. He further acknowledged that a four-minute voicemail could be the result of a "butt dial[.]"

Edward Harrison, director of sales and support for Buddi US, the manufacturer of Co-Defendant Johnson's ankle monitor, testified that the ankle monitor assigned to Co-Defendant Johnson was able to track his location, his movement, and the speed at which he moved. He said he was asked to review the data generated from the ankle monitor from 9:00 p.m. to 11:24 p.m. on April 21, 2019. He identified the report of that data, which was

admitted as an exhibit and published to the jury. Using a PowerPoint presentation, he then reviewed the data in detail with the jury. In essence, his testimony was that the ankle monitor data indicated the following movements and locations. Co-Defendant Johnson walked toward Mr. Craig's home, was inside Mr. Craig's home, walked away from the home, traveled in a vehicle to the Defendant's home, traveled in a vehicle back to an area on Volz Circle near Mr. Craig's home, walked to Mr. Craig's home, was inside Mr. Craig's home, walked from Mr. Craig's home to the area of Volz Circle, got into a vehicle, and traveled in the vehicle back to the Defendant's home at speeds reaching 72 miles per hour.

On cross-examination, he agreed that the data showed that Co-Defendant Johnson was on foot for a period of twenty-five minutes. He also agreed that it appeared that Co-Defendant Johnson was not picked up from the same spot at which he had been dropped off. He said his data tracked only the movements of Co-Defendant Johnson, and that he could not determine anything about the movements of the individual or individuals who dropped off and picked up Co-Defendant Johnson.

The Defendant elected not to testify but presented as a defense witness Co-Defendant Terry Lee Johnson. Co-Defendant Johnson testified that he had pled guilty to the crimes because he was guilty, and he described as follows what transpired that night. Mr. Craig was his sister's baby's father, with whom he had been "cool," and who had been robbed "quite a few times" since moving into the Church Street house. However, after he "put the word out," the robberies stopped. He explained that he and Mr. Craig were both drug dealers who sold marijuana, and that his putting the word out meant that he let everyone on the street know that he would kill the next person who robbed Mr. Craig. On the night of April 21, 2019, he stopped by Mr. Craig's home to "make sure everything was still straight[.]" He had his gun and his Steelers backpack with him at the time. The victim and Ms. Heflin were at the home with Mr. Craig playing a new game, and he sat and visited for approximately thirty minutes after ensuring that everything was "straight." He wanted to be sure that they had a gun, so he showed them his gun and the victim showed him the victim's gun.

Co-Defendant Johnson continued his account as follows. He left the house walking. He then went to the Defendant's house on Stardust Drive to check on his vehicle. Next, his vehicle dropped him off at Volz Circle and he then walked back to Mr. Craig's house. He was "high as a m*****f*****" and not really paying attention to who drove him in his vehicle back to Volz Circle. When he reentered Mr. Craig's house, he sat down and started talking. The victim chambered the victim's 9mm, and he responded by chambering his own gun. He asked the victim, "yo, what's going on[,]" and the victim responded that he did not "trust sh*t, especially what happened last time." The victim's comment about what happened last time made him start thinking about an episode from the previous year when

the victim had threatened to blow his head off. Because he believed the victim was about to kill him, he "domed" the victim, which he explained meant that he shot the victim in the head. Ms. Heflin began screaming, and he thought she was reaching for the victim's gun, so he shot her in the head as well. Afterward, he grabbed his backpack of marijuana that he had brought to the home, ran from the house, jumped in his vehicle, and went to the Defendant's residence to let him know what had happened. From there, he went to a nearby store, where he paid for a ride to Halls.

Co-Defendant Johnson testified that the backpack of marijuana that he took from Mr. Craig's home was the same backpack of marijuana that he had brought to the home. He said he had no intention to steal anything or to kill anyone. He explained that he was "high" at the time and operating under the street rule that one does not pull a gun on someone else unless "you're fixing to bust it." When asked who drove him to the Defendant's house, he attempted to plead his Fifth Amendment right not to incriminate himself by committing perjury. After the prosecutor announced that the State would not prosecute him for perjury in the event anything in his testimony conflicted with his guilty plea allocution, he continued with his testimony without directly naming the Defendant as the individual who drove him to and from Mr. Craig's house. Instead, he testified only that he traveled in his vehicle, that he did not drive, and that it had to be either the Defendant or the third individual in the vehicle who drove. He said Spinyatta Edwards was not the third individual in the vehicle. He acknowledged that he called the Defendant multiple times that day and also sent him the previously admitted text messages. He said his text message about needing the Defendant meant only that he was ready to leave Mr. Craig's home. His other text messages, in which he referred to things being "sweet" and about being ready to "pull that move" meant the same thing, that he was ready to leave Mr. Craig's home.

Co-Defendant Johnson testified that he knew that Mr. Craig kept his drug money hidden in the freezer because that was where Co-Defendant Johnson and all other drug dealers hid their cash. Had he intended to rob him, he would not have left the cash or any of the marijuana behind and "[w]ouldn't nobody been alive." He testified:

> Bro, I am a total gangster. I am a gangster in the penitentiary. I am a gangster on the street. Been a gangster all my life. So I don't got no qualms. If I am going to take something from somebody, I am going to take it and I am going to do what I got to do.

On cross-examination, Co-Defendant Johnson acknowledged that he had a number of prior convictions, including for sexual battery, theft, delivery and possession with intent to deliver cocaine, felony reckless endangerment and aggravated assault. He said he had

known the Defendant and the Defendant's family his entire life, and that he frequently hung out with the Defendant at the Defendant's Stardust Drive home. He again testified that he did not know if it was the Defendant who drove him to and from the area of the crimes but conceded that if the Defendant told Agent Covington that he had been the driver, it was probably true.

Co-Defendant Johnson acknowledged that he told Agent Covington in a statement that he shot the victim before the victim had a chance to raise his arm and took the victim's gun with him when he left. He testified that he did not take the gun and that he "probably was trying to defend somebody else" when he told Agent Covington he had taken the gun. He also explained that he was intoxicated at the time he gave the statement. He again denied that he stole the black bag of marijuana, repeating that it was his own bag that he brought with him to the home. He also denied that he reentered the home after the shooting and said that Ms. Heflin was mistaken in her testimony. He acknowledged that he told Agent Covington that he initially went to the home to try to sell a pistol. Finally, he denied that he and the Defendant ever discussed robbing Mr. Craig.

On redirect examination, Co-Defendant Johnson repeated that his intention in going to the home was to try to sell a pistol in order to get some fast cash. He testified that he never communicated anything to the Defendant about why he was going to the house and did not believe that the Defendant even knew that he was going to the house. He stated that there were "plenty of drugs" left around the house when he departed, and that he departed the house only with his own drugs.

Following deliberations, the jury convicted the Defendant of the indicted offenses, and the trial court subsequently sentenced him as a Range II, multiple offender to an effective sentence of life imprisonment in the Tennessee Department of Correction. Thereafter, the Defendant filed a timely notice of appeal to this court in which he challenges the sufficiency of the convicting evidence.

## ANALYSIS

The Defendant argues that the proof presented at trial was insufficient to show that a theft or robbery occurred, that the Defendant was criminally responsible for the actions of his co-defendant, or that the Defendant attempted to conceal or hinder the arrest of Co-Defendant Johnson. The State argues that the evidence, when viewed in the most favorable light, was sufficient for a rational jury to find the Defendant guilty of felony murder and especially aggravated robbery under a theory of criminal responsibility and to find the Defendant guilty of accessory after the fact by having aided Co-Defendant Johnson to evade arrest following the shooting. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

### A. Felony Murder and Especially Aggravated Robbery

For the purposes of this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate" a robbery or theft. Tenn. Code Ann. § 39-13-202(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). A person commits theft "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* at § 39-14-103(a). Especially aggravated robbery is a robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. *Id.* § 39-13-403(a).

The Defendant was charged and convicted for the felony murder and especially aggravated robbery of the victim under a theory of criminal responsibility. Under the theory of criminal responsibility, "[a] person is criminally responsible as a party to an

offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* at § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* at § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). However, "the evidence must establish that [the] defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted or assisted its commission." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013).

In his challenge to the sufficiency of the evidence in support of his first degree felony murder and especially aggravated robbery convictions, the Defendant first contends that there was insufficient evidence that a robbery or theft was attempted or occurred. In support, he cites, *inter alia*, the fact that a large sum of cash and marijuana was found by investigators at the scene, along with Co-Defendant Johnson's denial of having taken anything from the house except the backpack of marijuana that belonged to him and that he brought with him to the residence. However, there was ample evidence, including the Defendant's own statements to Agent Covington, that Co-Defendant Johnson went to the house for the purpose of committing a robbery or theft. Moreover, the jury was entitled to disbelieve Co-Defendant Johnson's disavowals of having taken the marijuana or the victim's gun and his claims that he went to the house with innocent intentions.

The Defendant next contends that there was insufficient evidence for the jury to find him guilty under a theory of criminal responsibility for the actions of Co-Defendant Johnson. He argues that the facts are distinguishable from the facts in similar cases in which defendants were found guilty under a theory of criminal responsibility, such as *State v. Carson*, 950 S.W.2d 951, 956 (Tenn. 1997) and *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002), because, unlike in those cases, he did not supply the gun, accompany Co-Defendant Johnson to the house, wait outside the house while Co-Defendant Johnson committed the crimes, or assist Co-Defendant Johnson in taking anything from the victim or Mr. Craig. The Defendant asserts that he "went about his business" after dropping Co-Defendant Johnson off near Church Street and that he had "no reason to think that [Co-Defendant] Johnson had an intent to steal marijuana from [Mr.] Craig[.]"

We respectfully disagree. Viewed in the light most favorable to the State, there was sufficient evidence for the jury to find the Defendant guilty of felony murder and especially aggravated robbery under a theory of criminal responsibility. In addition to the text and voicemail messages exchanged between Co-Defendant Johnson and the Defendant that indicated that the Defendant helped to plan the robbery and expected to share in the proceeds, the Defendant, by his own admission, knew for some time prior to the robbery of Co-Defendant Johnson's plans to steal Mr. Craig's marijuana. The Defendant also admitted that he drove Co-Defendant Johnson to Church Street and watched him exit the vehicle armed with a gun. Afterward, he drove Co-Defendant Johnson at a high rate of speed back to his own home, where he received some of the stolen marijuana. The jury was entitled to disbelieve the Defendant's self-serving statement that he was shocked upon learning that Co-Defendant Johnson had shot the victim and Ms. Heflin. Furthermore, even if true, the felony murder statute imposes liability for deaths occurring during the commission or attempted commission of enumerated felonies, regardless of the foreseeability of such deaths. *See* Tenn. Code Ann. § 39-13-202(a)(2); *see also State v. Winters*, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003) ("When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other.") (citations and internal quotation marks omitted).

## B. Accessory After the Fact

The Defendant contends that the evidence is insufficient to sustain his conviction for accessory after the fact because there was no proof that he intended to conceal or hinder his co-defendant's arrest. We, again, respectfully disagree.

An accessory after the fact is defined as a person "who, after the commission of a felony, with knowledge or reasonable ground to believe that the offender has committed the felony, and with the intent to hinder the arrest, trial, conviction or punishment of the offender . . . [p]rovides or aids in providing the offender with any means of avoiding arrest, trial, conviction or punishment[.]" Tenn. Code Ann. § 39-11-411(a)(2). The State presented proof that the Defendant picked Co-Defendant Johnson up after the shooting and robbery, and, having heard from Co-Defendant Johnson that he had just killed the victim and Ms. Heflin, drove Co-Defendant Johnson at a high rate of speed from the area to the Defendant's home. This was sufficient evidence for the jury to find the Defendant guilty beyond a reasonable doubt of being an accessory after the fact.

We, therefore, affirm the Defendant's convictions for first degree felony murder, especially aggravated robbery, and accessory after the fact.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE